## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETER J. MILLER, CLIFFORD HOYT, and CAMBRIDGE RESEARCH AND INSTRUMENTATION, INC., <br><br> **Plaintiffs,** <br><br> **v.** <br><br> PATRICK TREADO and CHEMIMAGE CORP., <br><br> **Defendants** | **CIVIL ACTION NO. 05 10367 RWZ** <br><br> **FILED UNDER SEAL** |

### APPENDIX OF CASES RELIED UPON IN
### DEFENDANTS' MEMORANDUM IN OPPOSITION TO
### PLAINTIFF'S MOTION TO AMEND COMPLAINT

Attached herein are copies of unreported cases cited to in the Defendants' Memorandum in Opposition to Plaintiffs' Motion to Amend Complaint. This list of cases is as follows:

*Jayson Assocs. v. UPS Co.*, No. Civ.A.04010771, 2004 WL 1576725 (D. Mass. July 15, 2004) (attached as Exhibit A);

*Dorazio v. Capital Specialty Plastics, Inc.*, No. Civ.A.01-6548, 2002 WL 31750215 (E.D. Pa. Dec. 9, 2002)(attached as Exhibit B);

*E.I. Du Pont de Nemours & Co. v. Okuley*, No. C2-97-1205, 2000 WL 19111430 (S.D. Ohio, Dec. 21, 2000)(attached as Exhibit C);

*Duke Univ. v. Elan Corp.*, No.1:04CV532, 2006 WL 267185 (M.D.N.C. Jan. 30, 2006)(attached as Exhibit D).

PATRICK TREADO AND CHEMIMAGE CORP.

By their attorneys,

/s/ Anthony J. Fitzpatrick
Anthony J. Fitzpatrick (BBO # 564324)
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
Telephone: 617.289.9220
Fax: 617.289.9201
e-mail: ajfitzpatrick@duanemorris.com

Paul D. Weller (admitted *pro hac vice*)
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA  19103
Telephone:  215.963.5530
eFax:  215.963.5001
e-mail:  pweller@morganlewis.com

Dated: June 19, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on June 19, 2006.

<u>/s/ Anthony J. Fitzpatrick</u>
Anthony J. Fitzpatrick

3



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1576725 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
**JAYSON ASSOCIATES,** INC.
v.
UNITED PARCEL SERVICE CO.
**No. Civ.A.04-10771-RWZ.**

July 15, 2004.

*MEMORANDUM OF DECISION*
ZOBEL, J.
*1 Plaintiff Jayson Associates, Inc. ("Jayson"), an advertising agency, developed a promotional line of products called "Track Stars," which consists of paper with precut lines allowing for assembly of three-dimensional vehicles. Without prior agreement, Jayson generated three such vehicles for defendant United Parcel Service, Inc.[FN1] ("UPS") in the hopes of creating a business relationship with UPS. Jayson then unsuccessfully presented Track Stars to UPS in April 2001 and again in May 2001. In a follow-up letter to UPS, Jayson enclosed a copy of a UPS truck and race car. In October 2001, Jayson presented Track Stars yet again to another UPS representative and sent another letter. At that time, Carolyn Bouche, a UPS employee, told Jayson that she would present Track Stars to headquarters and asked for pricing. In a letter dated October 30, 2001, Jayson sent her the requested price quotes. UPS never responded. Jayson alleges that in February 2003, he learned that UPS had mailed three dimensional paper UPS trucks to its clients in a national mailing in December 2002. Thereafter, on February 19, 2004, Jayson filed a Complaint in state court against UPS, alleging the following counts: (1) unjust enrichment, (2) quantum meruit, (3) conversion, (4) fraud, and (5) violation of Mass. Gen. Laws ch. 93A § 11. On April 16, 2004, defendant removed the case to this Court and now moves to dismiss all counts on the grounds that plaintiff's ideas are not protected as a

matter of law and some of the counts lack necessary elements.

FN1. UPS states that the correct title for defendant is UPS, Inc.

Plaintiff has a property right in a novel and original idea.[FN2] *Puente v. President and Fellows of Harvard College,* 248 F.2d 799, 802 (1st Cir.1957). However, "[a]n idea, as distinguished from the copyrighted contents of a book or a patented device or process, is accorded no protection in the law unless it is acquired and used under such circumstances that the law will imply a contractual or fiduciary relationship between the parties." *Id.* Such a relationship is implied when defendant " expressly or impliedly assent[s] to pay for the plaintiff's services and expenses ." *Anisgard v. Bray,* 419 N.E.2d 315, 318 (Mass.App.Ct.1981). While defendant is free to reject plaintiff's idea at any time before implementing it, once defendant tells plaintiff that it intends to pay him if his idea is used, it is bound to do so. *Id.*

FN2. Notably, the novelty of plaintiff's idea or lack thereof is not an issue here.

Here, Jayson alleges that after its initial presentation, Rosemary Windsor, a UPS Vice President, responded in a letter dated April 20, 2001, stating that "at this time, we do not feel that we can take advantage of the opportunities associated with Jayson Associates and Track Stars. We will certainly keep your information on file and should our position change, we will surely contact you." (Compl. at Ex. 5). Although the letter rejects Jayson's business proposal, it suggests that should UPS decide to use the paper vehicle idea, it will contact Jayson presumably to work out details concerning production and payment. Furthermore, Jayson alleges that at a later date, Carolyn Bouche, a UPS representative, expressed interest in Track

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1576725 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

Stars and requested price quotes from him, which again gives rise to the implicit understanding that UPS would pay Jayson if it used the paper vehicle idea. On this record, I cannot say that plaintiff has no rights in his Track Stars idea.

**\*2** UPS properly asserts that a cause of action for conversion (Count Three) does not apply to intangible items. *See Harvard Apparatus, Inc. v. Cowen,* 130 F.Supp.2d 161, 164 (D.Mass.2001)(" [T]his court previously stated that it could not locate any authority to suggest that Massachusetts has expanded the common law tort of conversion beyond its traditional application to chattels.") (quotations omitted). Contrary to Jayson's general response that Track Stars is tangible, its papers state otherwise: "[i]n furtherance of its conversion claim, Jayson alleges that UPS converted its creative expressions, ideas and product line known as the Track Stars program." (Pl.'s Opp'n at 5). Furthermore, Jayson does not allege that it owns the Track Stars idea in any legal sense. Although it states that the sample paper vehicles had a copyright label on them, Jayson nowhere argues that it actually owns a copyright. Defendant cannot convert what plaintiff does not own. *Nadal-Ginard v. Children's Hospital Corp.,* 1995 WL 1146118 (Mass.Super.). Count Three is dismissed.

Count Four alleges fraud. To establish a fraud claim under Massachusetts law, plaintiff must show that the defendant knowingly made a misrepresentation. with the intention of inducing plaintiff to rely on it and plaintiff did rely on it to his detriment. *Equipment & Sys. for Industry, Inc. v. Northmeadows Constr. Co.,* 798 N.E.2d 571, 574 (Mass.App.Ct.2003). UPS correctly states that the facts as alleged cannot support a fraud claim. Jayson's contention that the request for a price quote by UPS amounted to a misrepresentation that it would pay Jayson if it used the paper trucks and, further, that such request was made with the intent to induce Jayson to detrimentally refrain from seeking compensation, is unavailing. Count Four is dismissed.

Finally, UPS argues that Count Five, a Chapter 93A claim, is not actionable because Jayson's allegations are not sufficiently egregious. Massachusetts courts

have consistently held that a party who breaches a contract for his own benefit has acted unfairly for Chapter 93A purposes. *Arthur D. Little, Inc. v. Dooyang Corp.,* 147 F.3d 47, 55 (1st Cir.1998) (citation omitted). Furthermore, "Chapter 93A liability is decided case-by-case and Massachusetts courts have consistently emphasized the ' fact-specific nature of the inquiry." ' *Id.* At this stage, on these facts, Jayson's claim, which essentially alleges that UPS used its idea without compensating it as UPS implicitly agreed, suffices. In response to UPS's assertion that Jayson failed to allege damages, Jayson states that it seeks compensation at the rates embodied by its price quotes.

Accordingly, defendant's Motion to Dismiss is allowed as to Counts Three and Four only. Counts One, Two and Five remain.

D.Mass.,2004.
Jayson Associates, Inc. v. United Parcel Service Co.
Not Reported in F.Supp.2d, 2004 WL 1576725 (D.Mass.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2778233 (Trial Pleading) Answer (Jul. 29, 2004) Original Image of this Document (PDF)
• 2004 WL 2778230 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of its Opposition to Defendant's Motion to Dismiss All Counts of Plaintiff's Complaint (May 7, 2004) Original Image of this Document (PDF)
• 2004 WL 2778226 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant's Motion to Dismiss All Counts of Plaintiff's Complaint (Apr. 21, 2004) Original Image of this Document (PDF)
• 1:04cv10771 (Docket) (Apr. 16, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Attached Printing Summary Report for LOPEZ,KATHERINE 5689214**

| | |
|---|---|
| Your Search: | TI(E.I. /5 DU /5 PONT /5 DE /5 NEMOURS /5 CO. & OKULEY) |
| Date/Time of Request: | Monday, June 19, 2006 10:39:00 Eastern |
| Client Identifier: | E207900091 |
| Database: | w_csoh_cs_all |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 1597 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 31750215 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Jack A. DORAZIO, Plaintiff,
v.
CAPITOL SPECIALTY PLASTICS, INC.,
Defendant.
**No. CIV.A.01-6548.**

Dec. 9, 2002.
BERLE M. SCHILLER, Judge.

*MEMORANDUM AND ORDER*

*1 Presently before this Court is Defendant's motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. Because Plaintiff failed to present facts supporting the existence of a trade secret or any misappropriation thereof sufficient to allow a reasonable jury to find in his favor, I grant Defendant's motion.

Defendant Capital Specialty Plastics ("CSP") is an Alabama [FN1] corporation in the business of developing and selling packaging technology. In December 1999, CSP hired Plaintiff Jack Dorazio as a Key Account Manager, responsible for sales and marketing of the company's products. The parties executed an employment agreement, dated December 18, 1999, providing for a term of 10 years and for termination "for cause" at any time and without cause upon one year's written notice. Plaintiff alleges that he benefitted Defendant by calling on contacts that Plaintiff had cultivated in his many years in the industry. Plaintiff also alleges that he invented new and novel uses for Defendant's products. Despite these contributions, he avers, Defendant terminated Plaintiff in March 2001 without cause and later breached the employment agreement by attempting to terminate him a second time "for cause." Plaintiff sued in three counts: Count I for breach of contract, Count II for fraud by way of a scheme to steal Plaintiff's contacts and ideas, and Count III for misappropriation of Plaintiff's intellectual property rights in his inventions. The Court granted summary judgment in favor of Plaintiff on Count I and in favor of Defendant on Count III. The matter proceeded to a jury trial on Count II after re-styling the claim as one for misappropriation of trade secrets.

FN1. Because Plaintiff is a Pennsylvania resident, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

I. PROCEDURAL BACKGROUND

Plaintiff commenced this action by filing a Complaint on December 18, 2001. On November 15, 2002, following the submission of motions for summary judgment by both parties, the Court granted summary judgment for Plaintiff as to liability on the Count I claim and for Defendant on the Count III claim. On November 25, 2002, the Court entered an Order reflecting the fact that the parties had reached an agreement to settle the Count I claim for $160,000.00, exclusive of attorney's fees.

Only Count II of the Complaint survived Defendant's motion for summary judgment and is thus the principal subject of this Memorandum and Order. Therein, Plaintiff alleged that CSP's entry into the employment agreement was "part and parcel" of a scheme to defraud Mr. Dorazio and steal "all or most of his marketing knowledge, contacts and ideas." (Pl.'s Compl. ¶ 15.) By inducing him to enter into the agreement, Plaintiff averred, CSP caused him to "provide" these items of intellectual property. (*Id.* ¶ 16). Although it appeared from the Complaint that Plaintiff was attempting to make out a fraudulent inducement claim, Plaintiff argued at the summary judgment stage that Count II went "well beyond" a fraudulent inducement claim. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 3.) Plaintiff explained his Count II claim as centering on the allegation that "defendant purposefully and intentionally executed a scheme to hire people with contacts and business knowledge valuable to it and then fire them for concocted reasons after taking from them those contacts and that business knowledge." (*Id.*) The Court thus evaluated Plaintiff's Count II allegations under the two most closely applicable theories, fraudulent inducement and misappropriation of trade secrets.

The Court determined that Plaintiff could not survive summary judgment on a fraudulent inducement claim because Plaintiff could not show a legal duty separate from the duty to perform under the contract, demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or show special damages proximately caused by the alleged false

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31750215 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

representation. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.* 98 F.3d 13, 21 (2d. Cir.1996); *Best Western Int'l, Inc. v. CSI Int'l. Corp.,* Civ. A. No. 94-360, 1994 U.S. Dist. LEXIS 11815, at *17, 1994 WL 465905, at *5 (S.D.N.Y. Aug.23, 1994).

*2 The Court next analyzed Plaintiff's allegations under a misappropriation of trade secret theory. The Court examined Plaintiff's allegations, acknowledging that, under certain circumstances, New York law has recognized customer lists as trade secrets, and that the question of whether or not a customer list is a trade secret is generally a question of fact. *See A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 89 (2d Cir.1991); *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.,* 759 F.2d 1053, 1063 (2d Cir.1985); *see also Chevron U.S.A. Inc. v. Roxen Serv., Inc.,* 813 F.2d 26, 29 (2d Cir.1987); *Ashland Mgmt. Inc. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (N.Y.1993).

Neither Plaintiff's Complaint nor his Response to Defendant's motion for summary judgment explained precisely which contacts and/or knowledge formed the basis of his cause of action. Plaintiff's sworn affidavit, however, indicated that he spent approximately thirty years in the plastics business before coming to CSP, during which time he developed "significant business contacts." (Dorazio Aff. ¶ 4,8.) Moreover, Plaintiff stated that he "gave" CSP the names and data of approximately 500 high-level business contacts in the pharmaceutical and biotech industries and that CSP "utilized" that information in its marketing programs. (*Id.* at 13, 604 N.Y.S.2d 912, 624 N.E.2d 1007.) On this basis, the Court held that Plaintiff had put forth facts sufficient to create a material issue of fact as to the existence of a trade secret in the form of his business contacts and, thereby, survive summary judgment.[FN2]

> FN2. The Court also noted that the record contained no factual support with respect to Mr. Dorazio's marketing knowledge or ideas, the value thereof, or any steps he took to protect that knowledge or those ideas.

At trial, Plaintiff testified and presented evidence as to existence of his trade secrets and CSP's misappropriation thereof. At the close of Plaintiff's testimony, Defendant moved pursuant to Federal Rule of Civil Procedure 50 for judgment as a matter of law. The Court subsequently granted Defendant's motion.

## II. DISCUSSION

### A. Legal Standard

Under Federal Rule of Civil Procedure 50(a)(1), a court must grant a judgment as a matter of law "[i]f during trial by jury a party has been fully heard on an issue and there is no legally sufficient basis for a reasonable jury to find for the party on that issue." Although judgment as a matter of law should be granted sparingly, a scintilla of evidence will not enable the non-movant to survive a Rule 50 motion. *See Goodman v. Pa. Tpk. Com'n.,* 293 F.3d 655, 665 (3d Cir.2002) (citing *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993)). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube,* 4 F.3d at 1166 (internal quotation omitted). In evaluating a motion for a judgment as a matter of law, a court should apply the same substantive standard that the non-moving party must meet at trial, granting all reasonable inferences from the evidence to the non-moving party. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (3d Cir.2000).

### B. Misappropriation of Trade Secrets Under New York Law

*3 In this case, New York law [FN3] requires that Plaintiff demonstrate (i) that he possessed a trade secret and (ii) that Defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means. *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990); *Speedry Chem. Prods., Inc. v. Carter's Ink Co.,* 306 F.2d 328, 331 (2d Cir.1962); *Brignoli v. Balch Hardy & Scheinman, Inc.,* 645 F.Supp. 1201, 1205 (S.D.N.Y.1986); *Sublime Prods., Inc. v. Gerber Prods., Inc.,* 579 F.Supp. 248, 251 (S.D.N.Y.1984); *Rapco Foam, Inc. v. Sci. Applications, Inc.,* 479 F.Supp. 1027, 1029 (S.D.N.Y.1979); Restatement Second of Torts § 757 (1939). Under New York law, "[a] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31750215 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

to obtain an advantage over competitors who do not know or use it." _Ashland Mgmt. Inc. v. Janien,_ 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (N.Y.1993). In determining whether information constitutes a trade secret, New York courts have considered the following factors:

> FN3. As I stated in the Memorandum and Order of Nov. 15, 2002 (Document No. 33), New York law governs the Count II claim.

(1) the extent to which the information is known outside of plaintiff's business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by plaintiff to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. _Id_ at 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (citing Restatement Second of Torts § 757 cmt. b). The alleged trade secret or secrets must also have been developed by Plaintiff prior to, not during, his employment with CSP, in order for Plaintiff to claim ownership. _See No. Atl. Instruments, Inc. v. Haber,_ 188 F.3d 38, 47 (2d Cir.1999). In order to show that CSP misappropriated his alleged trade secrets, Plaintiff must show a confidential relation between the parties, disclosure of trade secrets, and use by defendant of this secret information. _Speedry,_ 306 F.2d at 331.

Here, Plaintiff has failed to present evidence that his contacts were misappropriated, or, were, in fact, trade secrets, such that a jury could not properly find for him. For purposes of this motion, I treat Plaintiff as having established that CSP executed a scheme to steal the trade secrets of several employees other than Mr. Dorazio by making use of their contacts and/or business knowledge and terminating some in a short time frame, because Defendant's Rule 50 motion was made before Plaintiff was able to introduce testimony as to that matter. (Nov. 26, 2002 Tr. at 153.) Plaintiff has fully presented his evidence, however, with respect to the existence of his trade secrets and the misappropriation thereof.

1. Mr. Dorazio's Alleged Trade Secrets

*4 Plaintiff's definition of what items embody his trade secrets evolved somewhat over the course of his

two full days of testimony. As noted, Mr. Dorazio's affidavit indicates that he spent approximately thirty years in the plastics business before coming to CSP, during which time he developed "significant business contacts." (Aff. of J. Dorazio at 4,8.) At trial, Plaintiff submitted a printout of a contact list containing approximately 1000 names. (Pl.'s Exh. 17.) Plaintiff also submitted a memorandum of law in support of the argument that this list was a trade secret based on the established proposition that customer lists can be trade secrets. (Pl.'s Mem. of Law.) Exhibit 17 is the only item in the record that potentially qualifies as a trade secret belonging to the Plaintiff.

With regard to the _Ashland Management_ factors, Plaintiff testified at trial as to the investment he made in the contact list over some thirty years. He indicated that he sent an average of four letters per year to those on his list, including a personal note with each. (Nov. 26, 2002 Tr. at 149.)

As to the value of this list, the Complaint states that Plaintiff's use of his contacts "had resulted" in "substantial sales" for CSP. (Pl.'s Compl. ¶ 10.) Plaintiff describes the contacts on the list as being "behind the scenes decision makers" who could be very helpful to someone trying to sell a product to their company. (Nov. 26, 2002 Tr. at 142.) Of the 1000 contacts contained in his exhibit, however, Plaintiff introduced direct evidence regarding the value of only one, Mr. Robert King. Plaintiff testified that his relationship with Mr. King enabled him, through an initial referral followed by series of subsequent referrals-each unconnected to Mr. King-to assist CSP in two major business ventures, the hosting of an Institute of Professional Packagers ("IOPP") conference and a joint development agreement with Pepsico. ( _Id._ at 58-59, 604 N.Y.S.2d 912, 624 N.E.2d 1007.) Plaintiff, however, failed to show that his contact with Mr. King was the but-for cause of these successes. The chain of connection between Mr. King and either IOPP or Pepsico involved several other contacts, such that it was difficult to determine how much, if at all, Plaintiff's relationship with Mr. King actually contributed to his ability to help the company in these two instances. Furthermore, the only "sale" that Mr. Dorazio can point to is a prototype part contract with Glaxo Smith Kline ("GSK"). (_Id._ at 15-17, 604 N.Y.S.2d 912, 624 N.E.2d 1007.) There is no direct evidence in the record that this sale resulted from Mr. Dorazio's contacts, and Mr. Dorazio testified that Pepsico and IOPP were the only instances in which had utilized his Exhibit 17 contacts for the benefit of CSP (Nov. 25, 2002 Tr. at 105.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2002 WL 31750215 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

With regard to secrecy, Plaintiff testified that "no one," except the individuals whom he had supervised, had ever seen the list before trial. (*Id.* at 47, 604 N.Y.S.2d 912, 624 N.E.2d 1007.) Plaintiff testified that he kept the list in his home and noted to his former employers that he had such a list. (*Id.* at 34-35, 604 N.Y.S.2d 912, 624 N.E.2d 1007.) However, as Defendant noted, while CSP took steps to protect its own trade secrets through the employment contract, Mr. Dorazio, who was represented by counsel in the contract negotiations, failed to even raise the issue. Moreover, Plaintiff did not tell the employees who helped him compile the list to keep it secret. (*Id.* at 49, 604 N.Y.S.2d 912, 624 N.E.2d 1007.)

Plaintiff was also unable to show that the contacts had been exclusively his in the first instance. Plaintiff testified that many of these contacts came from work done for other employers. (*Id.* at 46, 604 N.Y.S.2d 912, 624 N.E.2d 1007.) This distinguishes Plaintiff's contact list from the customer lists protected under New York law. Customer lists are typically developed by a company through the work of its employees. It thus has an inchoate proprietary interest in the list. If a non-employee attempts to make use of the list, he or she may be liable for trade secret misappropriation. *See, e.g., Defiance Button, 759 F.2d 1053, 1063-64.* Of course, I cannot here resolve the issue of who, as between Mr. Dorazio and his former employers, owned his contact list. At the same time, I find it all the more difficult to view these contacts as trade secrets belonging to Mr. Dorazio when he developed them while working for another employer. I thus find that Exhibit 17 does not qualify as a trade secret under New York law.

## 2. Misappropriation

*\*5* During his short employment with CSP, Dorazio claims to have given CSP the names and data of approximately 500 high-level business contacts in the pharmaceutical and biotech industries. (Dorazio Aff. ¶ 13.) At trial, however, Plaintiff stated that the 500 contacts that he claimed to have given CSP were not a part of the 1000 contacts contained in Exhibit 17. (Nov. 26, 2002 Tr. at 27.) Instead, Plaintiff testified that the 500 contacts he gave CSP were possibly contained in Exhibits 14, 15, and 16. ( *Id.* at 24-25.) Exhibits 14, 15, and 16 contain reports with publicly available information about companies that Mr. Dorazio produced while employed at CSP. Indeed, Mr. Dorazio testified that he did not regard Exhibits

14, 15 or 16 as trade secrets. (*Id.* at 26.) Plaintiff also testified that the contacts he allegedly gave to CSP were contained in "visit reports" that Plaintiff had neither produced nor discussed until he was cross-examined. (*Id.* at 25-26.)

An alternative theory of misappropriation advanced by the Plaintiff was that he used the alleged trade secrets contained in Exhibit 17 for CSP's benefit during his employment. First, as a factual matter, even if Plaintiff had shown that Exhibit 17 was a protectable trade secret, Plaintiff introduced direct evidence as to only one contact that he used from the list during his employment and provided no evidence of any use of any of his contacts by CSP in the wake of his departure. Although Mr. Dorazio may have accessed the contacts contained in his visit reports through the use of his Exhibit 17 contacts, he has not introduced his visit reports into evidence, nor has he provided direct evidentiary support, other than a general assertion, that CSP improperly benefitted from his Exhibit 17 contacts by way of his visit reports. (*Id.* at 25-26.)

Moreover, as a matter of law, Plaintiff has not established that the use by an employee of trade secrets for the benefit of his employer constitutes misappropriation. I can find no authority to support such a proposition. Again, New York law has found misappropriation where a defendant former employee has improperly used a plaintiff former employer's trade secrets. *See, e.g., Speedry, 306 F.2d at 331.* It has not recognized that an employer's passive receipt of a benefit from an employee's use of trade secrets constitutes misappropriation.

*\*6* Specifically, Plaintiff has made no showing of a breach of duty or confidence accompanying this use that would cast doubt on its appropriateness. Plaintiff, it seems, would have the Court treat the existence of a "scheme" as prima facie evidence of misappropriation of his trade secrets. In this regard, Plaintiff makes much of the fact that his termination occurred despite CSP's representation to him that sales would require substantial time and that, because of this, he and CSP entered into a ten year contract. The implication seems to be that Defendants had to have a motive other than performance for terminating Plaintiff after a short period of time. Yet Plaintiff has not shown that his contacts were of sufficient value to CSP to create a motive for CSP to breach the employment contract in order to obtain them.

Finally, even if I were to find evidence of misappropriation, Plaintiff has failed to show how he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31750215 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

has been harmed. Plaintiff has made no showing that CSP has taken any of Plaintiff's relationships from him, or used them in such a way as to diminish their value. Plaintiff also has a provision in his contract requiring CSP to pay him-even after termination-a commission on top of his salary for "commitments obtained" during his employment (Employment Agreement ¶ 3c). Thus, Plaintiff would have continued to reap the benefits of commitments obtained through the use of his contacts, had he, in fact, generated commitments during his employment with CSP.[FN4]

> FN4. Plaintiff testified that he had not obtained any commitments during his employment with CSP. (Nov. 26, 2002 Tr. at 20.)

### III. CONCLUSION

Under these circumstances, no reasonable jury could find that Mr. Dorazio possessed a trade secret and that CSP used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means. I therefore grant Defendant's motion for judgment as a matter of law. An appropriate order follows.

### *ORDER*

AND NOW, this day of December, 2002, upon consideration of Defendant's oral motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, it is hereby ORDERED that:
1. Defendant's Rule 50 motion is GRANTED.
2. Based on my earlier grant of summary judgment in Plaintiff's favor on Count I, Plaintiff's counsel shall submit a petition for attorney's fees by December 30, 2002.

E.D.Pa.,2002.
Dorazio v. Capitol Specialty Plastics, Inc.
Not Reported in F.Supp.2d, 2002 WL 31750215 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:01CV06548 (Docket) (Dec. 18, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                    Page 1

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

▶

Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Eastern
Division.
E.I. DU PONT DE NEMOURS AND COMPANY,
Plaintiff,
v.
Dr. John J. OKULEY, Defendant.
No. C2-97-1205.

Dec. 21, 2000.

*MEMORANDUM AND ORDER*
HOLSCHUH, Magistrate J.
**\*1** This is an action for declaratory and other relief to determine conflicting claims of ownership to a patentable invention arising from university research conducted by Defendant, Dr. John Okuley, and sponsored by Plaintiff, E.I. Du Pont de Nemours Co. ("Du Pont"). Jurisdiction is based on diversity of citizenship. This matter is currently before the Court on cross motions for summary judgment.

I. Background

This suit arose out of a Research Collaboration Agreement between Dr. John Browse, head of the Institute of Biological Chemistry at Washington State University ("WSU"), and Plaintiff Du Pont. Du Pont sought to isolate and clone certain genes that would be useful in engineering crop plants yielding vegetable oil containing a higher quality or quantity of beneficial fatty acids and lower quantities of saturated fats. If successful, Du Pont hoped to patent these genes. The Research Collaboration Agreement, drafted by Du Pont, was in the form of a letter to Dr. John Browse, dated December 14, 1989. It was accepted and signed by Dr. Browse, and approved by WSU on December 15, 1989. The relevant portions read as follows:

Dear John:
Based upon your discussions with John Pierce and Pablo Scolnik of E.I. du Pont de Nemours and Company ("Du Pont"), we are pleased to have you collaborate with us in efforts to identify lipid variations in tDNA-based *Arabidopsis* mutants. The terms and conditions we propose to conduct this Research Collaboration Agreement are set forth below:

3. Your work under this Agreement shall be to collaborate in screening, identifying and cloning genes that affect seed lipid composition from among those *Arabidopsis* mutants made available to you by Du Pont.

4. For purposes of this Agreement the following definitions shall apply:
a. "Primary DNA" shall mean DNA isolated from *Arabidopsis* by the tDNA tagging method (mutant and corresponding wild type DNA).
b. "Secondary DNA" shall mean DNA isolated from any source using the Primary DNA as a probe. Secondary DNA shall further be classified as "homologous" if it determines substantially the same function(s) as that of the Primary DNA used to isolate it. Secondary DNA shall be classified as "heterologous" if it determines substantially different function(s) (that is, desaturation of a different fatty acyl group or desaturation of the same acyl group on a different lipid structure) from that of the Primary DNA used to isolate it ...
5. The financial investment by Du Pont in developing "Biological Material," for example, DNA, RNA, genes, plasmids, constructs, protein products, callus, seeds, and any replication or derivative of the foregoing, is extremely high. Therefore, the following provisions will apply to rights to the Biological Materials.
a. Any Biological Material, including *Arabidopsis* tDNA mutants, made available to you during the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

Page 2

term of the Agreement by Du Pont is the property of Du Pont. You shall use such Biological Material solely for research purposes in support of the work contemplated under this Research Collaboration Agreement with Du Pont. You and individuals working under your direction shall not transfer or give any such Biological Material or any portion thereof to any third party without the prior written permission of Du Pont ...
**\*2** b. All Primary and Secondary DNA isolated from Biological Material is the property of Du Pont, except in the special cases defined in 5 d below.
c. Du Pont will have the first opportunity to use the Primary DNA to identify and clone the corresponding genes from oilseed crop species. If Du Pont is unsuccessful in cloning the corresponding genes from oilseed crop species within a period of nine (9) months following the isolation of the Primary DNA, then you are free to attempt similar work.
d. In the event you are successful in isolating
a. Secondary, heterologous DNA; or
b. Any secondary homologous DNA, that is isolated following the nine (9) month period specified in 5c above, Washington State University will own these properties.
e. Washington State University shall offer Du Pont a first right to refuse an exclusive license for the commercial use of the Secondary DNA isolated by you. Du Pont will inform Washington State University of its desire to obtain an exclusive license within six (6) months of the offer. Du Pont will negotiate in good faith reasonable royalties for the commercial use of this DNA.
6. You agree to communicate promptly to Du Pont any ideas and improvements that you conceive or make arising from your activities during the term of this Agreement and hereby assign all rights and title to such ideas and improvements to Du Pont, excepting rights and title to Secondary, heterologous DNA or Secondary homologous genes isolated by you as described in 5 d above. If Du Pont considers any ideas and improvements arising under this Agreement to be inventions on which Du Pont wishes to apply for United States or foreign patents, you shall at our request execute all papers we deem necessary or advisable for the filing and prosecution of such patent applications and for providing confirmation of Du Pont's legal title to

the inventions, applications, and any patents granted ...

(Ex. E to Pl.'s Mot. Summ. J.).

To summarize the terms of the agreement, the parties agreed to collaborate to isolate and clone genes that encode enzymes of a fatty acid desaturase ("FAD"). One way that isolation could be accomplished was to screen a large number of individual plants whose DNA has been chemically marked, or "tagged," at different places along the genetic structure. (Ex. B to Pl.'s Mot. Summ. J.). The plant *Arabidopsis* is often used for this purpose; Du Pont provided the tagged *Arabidopsis* mutants from its extensive collection.[FN1] The tagging process causes certain genetic characteristics to be enhanced or suppressed, allowing scientists to identify certain genes of interest. Fragments of the DNA are then chemically separated, and these strands are tested to confirm that the gene which encodes a particular function or trait has, in fact, been discovered. (*Id.*).

> FN1. This was not a typical sponsorship agreement. Rather than providing funding for the research, Du Pont provided access to a large library of biological material in the form of tagged *Arabidopsis* mutants.

Research on the project began in 1989. Jonathan Lightner, a Ph.D. candidate at WSU, worked with Browse on much of the initial research. In 1990, Du Pont scientists isolated the FAD3 gene, and Du Pont filed a patent application naming Dr. Browse as a co-inventor of FAD3. In accordance with the Research Collaboration Agreement, he executed an assignment of his rights in the invention to Du Pont. Researchers continued to look for the FAD2 gene.[FN2]

> FN2. For a time, Du Pont scientists believed that they had also isolated the FAD2 gene; however, they were mistaken.

**\*3** In November of 1991, Defendant Dr. Okuley enrolled as a post-doctoral researcher at WSU and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

began working on the Du Pont project under Dr. Browse's supervision. Okuley was paid by WSU and was subject to the terms and conditions of WSU's Faculty Manual, including the patent policy. The policy imposed a duty on employees to disclose "all potentially patentable inventions and discoveries developed while employed at WSU to the Intellectual Property Committee for review." It also provided that, unless agreed otherwise with an outside sponsor, WSU "shall own the right to all patentable property developed as a result of University employment." (Compl.¶¶ 10-12). In addition, it explicitly stated that the proprietary rights of the university and its employees are subject to the terms of outside sponsorship agreements.

When Okuley arrived at WSU, Jonathan Lightner told him about prior work done by Ken Feldmann, a scientist at Du Pont, and Mary Aegerter, a post-doctoral faculty member at WSU, on a particular strain of *Arabidopsis* mutant known as "line 658-75." Both Feldmann and Aegerter had isolated line 658-75 and believed that it could be tagged for the FAD2 gene but, because they were unable to clone or sequence the gene, they eventually abandoned the research. Lightner told Okuley that he thought that, although Feldmann's and Aegerter's research was inconclusive, it was still possible that line 658-75 may be tagged for the FAD2 gene. Lightner had conducted experiments to test the validity of Feldmann's experiments, had grown FAD2 mutant plants of line 658-75, and had ground up some of these plants to obtain DNA. He had then abandoned the project to devote more time to his dissertation. Lightner gave Okuley the remaining seed and DNA samples obtained from line 658-75.

Shortly after Okuley arrived at WSU, he and Dr. Browse visited Du Pont's laboratories in Wilmington, Delaware to discuss the project. (Okuley Dep. at 77-78). Dr. Browse believed that the best way to proceed with attempts to isolate the FAD2 gene was to use a "low stringency probe" process using samples of the FAD3 gene, since earlier research on line 658-75 had been inconclusive. However, while waiting for Du Pont to send samples of the FAD3 gene, Dr. Okuley did

further research on line 658-75. In December of 1991, Okuley was able to "rescue" a single plasmid known as "plasmid 658-1." Okuley did not know it at the time, but this strand was later determined to encode a partial sequence of the FAD2 gene. Once he received samples of FAD3 from Du Pont, Okuley put his lab dish containing plasmid 658-1 in a freezer and, for the next six months, proceeded to conduct research using the low stringency probe method preferred by Dr. Browse. His efforts were unsuccessful.

In the summer of 1992, Dr. Okuley moved to Columbus, Ohio. At Dr. Browse's suggestion, he obtained "visitor" access to Dr. Keith Davis's laboratory facilities at The Ohio State University ("OSU") so that he could continue his research on the Du Pont project. Browse informed Okuley that he could not take any of Du Pont's biological material with him to OSU without Du Pont's approval. Browse testified that once he obtained Du Pont's permission, he sent the biological material, including the dish of plasmid 658-1, to Okuley at OSU where Okuley continued to work on the project. Linda Floyd, a staff attorney at Du Pont, denies that she gave Browse permission for Okuley to work on the project at OSU. (Floyd Aff. ¶ 2). Although Browse and Floyd had some discussion concerning the advisability of an agreement between Du Pont, WSU and OSU concerning patent rights, the parties agree that no such contract was ever drafted.

*4 During his time at OSU, Okuley was still employed by WSU and continued to be supervised by Dr. Browse, communicating with him via telephone, e-mail and fax. (Compl.¶ 13). In August of 1992, while at OSU, without the knowledge or approval of either Browse or Du Pont, Okuley decided to pursue further experiments with line 658-75. Within weeks after embarking down this path of research, Okuley discovered and isolated the FAD2 gene and proceeded to clone it. (Okuley Dep. at 164). On or about August 26, 1992, Okuley notified Dr. Browse that he had isolated the FAD2 gene. By September 12, 1992, Okuley had completed sufficient sequencing to know for certain that he had cloned the FAD2 gene. Browse then directed him to send a sample of the partial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

sequence of the DNA clone to Du Pont, which Okuley did on September 22, 1992. By October 16, 1992, Du Pont scientists had completed the DNA sequence for FAD2 in *Arabidopsis,* and had isolated and cloned sequences for FAD2 in soybean and canola seeds. That same month, Du Pont decided to patent the invention.

Du Pont attorney Linda Floyd was in charge of preparing the patent application. She collected information from Okuley, Browse, Lightner, and several Du Pont scientists concerning inventorship. On November 17, 1992, Du Pont filed an application for the FAD2 gene invention; it was called "Fatty Acid Desaturase Genes from Plants." The initial application listed Dr. Lightner and Dr. Naren Yadav of Du Pont as co-inventors. Okuley suspected that he was not listed only because no agreement had ever been executed concerning his work at OSU. (Okuley Dep. at 209). He protested, but Ms. Floyd refused to add Okuley's name.

In January of 1993, Okuley approached Jim Wilkens of OSU's intellectual property office to discuss the matter. Wilkens informed Okuley that since he was using OSU's laboratories, he had a statutory duty to report all potentially patentable inventions to OSU. Okuley also discussed the matter of inventorship with Larry Simonsmeier, the chief intellectual property officer at WSU. Lightner wrote to Floyd on January 21, 1993 expressing his concern that Okuley's name was not included as an inventor. (Ex. 25 to Def.'s Mot. Summ. J.). In February of 1993, after further consideration, Ms. Floyd decided she should remove Dr. Yadav's name from the patent application, but still refused to include Okuley's name. That spring, Bruce Morrissey, another Du Pont attorney, took over the processing of the patent application when Floyd took maternity leave. In April of 1993, Lightner refused to sign the Declaration of Inventorship unless Dr. Okuley's name was included as a joint inventor. Morrissey reviewed the matter and agreed that Okuley's name should be added. [FN3]

> FN3. On June 23, 1993, Bruce Morrissey filed an amendment to the original patent application adding Okuley's name and

deleting Yadav's name. (Ex. U to Pl.'s Mot. Summ. J.).

Morrissey then informed Okuley that, pursuant to the terms of the Research Collaboration Agreement, Okuley was obligated to assign his interest in FAD2 to Du Pont. On May 12, 1993, he sent Okuley the documents to be signed. Before he executed the assignment, Dr. Okuley obtained from Jim Wilkens of OSU a waiver of any claims OSU may have to the invention because of Okuley's work in its labs. The May 28, 1993 assignment read as follows:
*5 Dear Dr. Okuley:
Upon the recommendation of Dr. James Wilkens of our Office of Technology Transfer, and in view of the circumstance that your contributions to this invention were partly made while you were at Washington State University and that any contributions to this invention made while you were a visitor in Prof. Keith Davis' laboratory at Ohio State University were made by you in your capacity as an employee of Washington State University, The Ohio State University hereby waives any claim it might have in this invention and in any patent rights therein, and transfers the same to you, subject to any rights of Washington State University or its research sponsor, E.I. du Pont de Nemours, Inc.

(Ex. 31 to Def.'s Mot. Summ. J.).

On the same date, Okuley executed a standard form assignment transferring to Du Pont his "entire right, title and interest in" FAD2, and agreeing to " execute all applications, papers or instruments necessary or required" in order for Du Pont to obtain and enforce proper patent protection for the invention. (Ex. R to Pl .'s Mot. Summ. J.). In connection with that assignment, he also executed a Declaration of Inventorship stating that he and Jonathan Lightner were co-inventors, and a Power of Attorney which allowed Linda Floyd to act as his attorney in processing the patent application and transacting business with the Patent and Trademark Office. (Ex. S to Pl.'s Mot. Summ. J.). [FN4] Okuley returned these documents to Morrissey with a cover letter that stated in part, "I feel that the naming of Jonathan Lightner and myself as inventors truely [sic]reflects the inventorship ... I have executed this assignment because both Linda Floyd with Du

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

Pont-Legal and yourself have advised me that it is my obligation to do so."

> FN4. Lightner executed similar documents.

After sending the FAD2 sample to Du Pont in the fall of 1992, Okuley continued to work on the project at OSU until June 1, 1993, confirming the identity of the FAD2 gene by "transforming" a FAD2 chimeric gene construct into an *Arabidopsis* FAD2 mutant. According to Okuley, this created generalized claims that the FAD2 gene was capable of genetically engineering an oil producing crop plant; these claims allegedly formed the basis for the specialized claims involving other plant species, which arose from experiments conducted by the Du Pont scientists. In June of 1993, Okuley moved back to Washington and began to prepare his data for publication. In the fall of that year, Okuley accepted a position at Denison University and left WSU.

In November of 1993, Du Pont decided to file a Continuation in Part ("CIP") application, otherwise known as the 1043A patent, which augmented the initial patent application.[FN5] It expanded the scope of the original claims to include FAD2 sequences from corn and castor, and added new data to support the original claims. (Ex. W to Pl.'s Mot. Summ. J.; Christenbury Aff. ¶ 3). [FN6] In connection with the 1043A application, Du Pont requested that Okuley and Lightner execute another standard form assignment conveying rights to Du Pont.[FN7] Lightner promptly executed his; Okuley did not.

> FN5. A continuation-in-part ("CIP") is an application filed during the lifetime of an earlier nonprovisional application, repeating some substantial portion or all of the earlier nonprovisional application and adding matter not previously disclosed. *In re Klein,* 1930 C.D. 2, 393 O.G. 519 (Comm'r Pat.1930). It may or may not claim new subject matter. CIP applications may claim the benefit of the filing date of the parent application only with respect to

subject matter that was adequately disclosed in the parent application.

> FN6. The 1043A application was eventually withdrawn in favor of filing the 1043D application. (Christenbury Aff. ¶ 3).

> FN7. According to Du Pont, Dr. Okuley was not directly involved in this additional work. (Compl.¶ 17). However, Du Pont claims that it is the custom and practice before the Patent and Trademark Office to have all persons listed as inventors on the original patent application execute new declarations and assignments when a CIP is filed.
>
> Okuley contends that his transformation data, conducted between September of 1992 and May of 1993, forms the basis for these additional claims.

*6 On December 3, 1993, Okuley e-mailed Morrissey, indicating that he had not yet had time to review the CIP application. (Ex. Y to Pl.'s Mot. Summ. J.). Okuley expressed concern about how much he was contractually obligated to do in connection with the patent, noting that he no longer had a lot of time to devote to it. He also wrote, "I understand that it is your personal opinion that I am covered by the agreement with John Browse and Washington State University ... If, as it states in the declaration, you are acting as my lawyer, I would appreciate your advising me on these concerns." [FN8] Morrissey responded that he did not anticipate that Okuley would need to devote much more time to the patent. He also told Okuley that he was obligated to assign his rights in the invention to Du Pont.

> FN8. The "declaration" refers to the Declaration and Power of Attorney executed by Okuley so that Du Pont's legal counsel could prosecute the patent application on his behalf.

Then, without Du Pont's knowledge, Okuley altered the assignment so as to require Du Pont to pay

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

Okuley a "reasonable royalty" for use of the invention. [FN9] (Ex. Z to Pl.'s Mot. Summ. J.). Okuley executed this altered assignment on December 30, 1993 and returned it, without a cover letter, to Morrissey. Morrissey did not notice the alterations, and simply placed the assignment in Okuley's file at Du Pont.

> FN9. Plaintiff claims that Okuley went to great pains to use a nearly identical font, type-size, and page set-up to make the altered assignment look as much as possible like the original one. Okuley claims that he attempted to duplicate the format so that Morrissey could not object to the document on those grounds. He testified that he fully expected Morrissey to read the document and then call him to discuss it. (Okuley Dep. at 276).

In June of 1994, Du Pont filed a second CIP, also known as the 1043B patent application, which added additional examples.[FN10] In connection with this CIP, Barbara Siegell, another Du Pont attorney, asked Okuley to re-execute the standard forms. (Ex. AA to Pl.'s Mot. Summ. J.). Okuley did not respond. After receiving a second letter from Ms. Siegell in September of 1994, Okuley executed another Declaration and Power of Attorney, but not another assignment. Okuley allegedly explained to Siegell that he had already executed an assignment which entitled him to receive royalties. After retrieving the modified assignment from Okuley's file, Siegell told Okuley that Du Pont had not noticed that the earlier assignment had been modified, but that the royalty provision inserted by him was unacceptable. (Okuley Dep. at 283-87). Dr. Okuley has refused to execute another assignment unless Du Pont agrees to pay him a royalty on any commercial exploitation of the patent. (Compl.¶¶ 19-21).

> FN10. The 1043B application was also later withdrawn in favor of the 1043D application. (Christenbury Aff. ¶ 4).

Okuley then hired an attorney. In March of 1995,

Okuley's counsel urged WSU to negotiate a licensing agreement with Du Pont. (Ex. EE to Pl.'s Mot. Summ. J.). WSU refused to do so. Larry Simonsmeier of WSU replied that, pursuant to the Research Collaboration Agreement and the WSU Faculty Manual, Du Pont was the rightful owner of the invention and no royalty arrangements were warranted. (Ex. 33 to Def .'s Mot. Summ. J.). In March of 1996, WSU subsequently assigned its rights in the invention, as well as its claims against Okuley, to Du Pont. (Ex. GG & HH to Pl.'s Mot. Summ. J.).

In 1997, Du Pont filed suit alleging three causes of action: (1) Du Pont requests a declaratory judgment that Okuley has no legal interest in the invention and is contractually obligated to assign his rights to Du Pont; (2) As assignee of claims which arose out of the employment relationship between WSU and Okuley, and an intended third party beneficiary of that employment agreement, Du Pont also alleges that Okuley breached his employment contract with WSU by refusing to execute the necessary assignments in connection with the CIP applications, and requests specific performance; and (3) Du Pont alleges a breach of Okuley's common law duty to assign to WSU his rights in the invention, and again seeks specific performance. Du Pont claims standing to enforce WSU's rights both as the assignee of WSU's claims, and under the Research Collaboration Agreement.

*7 Okuley filed a third party complaint against WSU, which this Court later dismissed. Okuley also filed the following counterclaims against Du Pont: (1) since Okuley executed the initial assignment under duress, by mistake, without benefit of counsel, and because he was misled by Du Pont and WSU with respect to his obligation to assign his invention to Du Pont, the assignment is null and void and should be rescinded; (2) since the invention was made outside the scope of his assigned duties with WSU, neither Du Pont nor WSU have any ownership interest in the invention. Rather he claims that ownership vested in him under the common law of the State of Ohio and, since Ohio State University released all of its rights to him, he is now the sole owner of the invention; (3) even if WSU once had an ownership interest in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

the invention, title now vests fully in him because WSU breached its employment agreement with him; (4) even if WSU once had an ownership interest in the invention, title now vests fully in him because WSU failed to follow up on the invention as required in the Faculty Manual; (5) even if WSU once had an ownership interest in the invention, title now vests fully in him because WSU failed to license the invention as required by § 5e of the Materials Transfer Agreement; (6) because Okuley undertook this work on his own initiative and without the assistance of any other individual, he is the sole inventor, and the sole owner of the invention in question. He requests declaratory and other relief to vest in him full right, title, and interest to the FAD2 gene.

In September of 1998, Du Pont filed another CIP, also known as the 1043D patent application, and withdrew the 1043A and 1043B applications. The 1043D application lists Dr. Okuley and Dr. Lightner as co-inventors. However, Du Pont now also wants to add four other Du Pont scientists, who contributed to the isolation of FAD2 in non-*Arabidopsis* species, as co-inventors. (Christenson Aff. ¶ 5). It appears that Dr. Okuley has refused to consent to this correction of inventorship and, in light of Okuley's persistent refusal to execute earlier assignments, Du Pont has not asked Okuley to execute an assignment in connection with the 1043D CIP application.

## II. Standard for Granting Summary Judgment

Federal Rule of Civil Procedure 56(c) provides: [Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original); *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

**\*8** Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 467 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627 (1944)); *accord County of Oakland v. City of Berkley,* 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for what was formerly referred to as a directed verdict. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Anderson,* 477 U.S. at 250.
The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson,* 477 U.S. at 251-52. Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 8

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970) (footnote omitted); *accord Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1455-56 (6th Cir.), *cert. denied,* 469 U.S. 1062 (1984). Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, " unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes,* 398 U.S. at 157-60.

*9 If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 252.
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

### III. Discussion

Both parties have moved for summary judgment.

Plaintiff contends: (1) having previously declared under oath that he is the co-inventor of FAD2, and that Du Pont owns the invention, Defendant is estopped from claiming otherwise absent proof of fraud or other misconduct by Du Pont; (2) under the Research Collaboration Agreement between Du Pont and WSU, ownership of FAD2 rests with Du Pont; (3) as an employee and faculty member of WSU, Defendant was bound by the terms of the Faculty Manual and was thus subject to the Research Collaboration Agreement; and (4) because no patent has yet been issued, and because Defendant has not established any ownership interest in the invention, Defendant has no standing to seek a determination that he is the sole inventor.

Defendant claims that he is entitled to summary judgment for the following reasons: (1) because Defendant used OSU's equipment and facilities, OSU was the sole owner of the FAD2 gene invention and it assigned its rights to Defendant, who was the sole owner of the invention at the time of the assignment; (2) Defendant's original assignment of rights to Du Pont is invalid because it was fraudulently induced; (3) Defendant's assignment of rights to Du Pont is void under the doctrine of mutual mistake; (4) Defendant is the sole inventor of the FAD2 gene because he is the only person who made a significant contribution to the invention; and (5) Defendant is the sole inventor, or at least a joint inventor, of the inventions set forth in later patent applications, which Defendant has never assigned to Du Pont.

### A. Who is the Inventor?

Defendant claims that before the Court can determine who is the rightful owner of the FAD2 invention, the Court must first determine who invented FAD2 because ownership follows inventorship. Although Dr. Lightner and Dr. Okuley are listed as co-inventors on the patent application, Okuley now claims that Lightner's name should be excluded because Lightner's suggestion that Okuley pursue a particular line of research did not constitute a significant contribution to the invention. In response, Du Pont asserts two arguments: 1) the doctrine of assignor estoppel precludes Okuley

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

Page 9

from claiming Lightner is not a co-inventor; and 2) this Court has no jurisdiction to determine inventorship because the patent has not yet issued. Specifically, Du Pont claims that since no patent has issued, Okuley is limited to the administrative remedies found in 35 U.S.C. § 116. In the alternative, Du Pont argues that since Okuley has already assigned any ownership interest that he might have previously had in the invention, he has no standing to challenge the determination of inventorship. Finally, Du Pont argues that even if Okuley had standing, the Court should still find that he was not the sole inventor of FAD2.

**\*10** The doctrine of assignor estoppel is an equitable doctrine that generally precludes someone who has assigned patent rights to another from claiming that the patent is invalid. *Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d 1220, 1224 (Fed.Cir.1988). Okuley argues that the doctrine is inapplicable because he is not challenging the validity of the patent, but rather the determination of inventorship and the validity of his assignment to Du Pont. Du Pont nevertheless claims that the doctrine should be applied in this case. Under oath, Dr. Okuley has executed two Declarations stating that he and Dr. Lightner were co-inventors. He also stated in a cover letter to Bruce Morrissey that he believed that "the naming of Jonathon Lightner and myself as inventors [sic] reflects the inventorship of the claimed subject matter ." (Ex. Q to Pl.'s Mot. Summ. J.). Plaintiff cites two patent infringement cases in which inventors who made statements concerning inventorship in their Declarations were barred by the doctrine of assignor estoppel from later claiming that those statements were inaccurate because "[e]quity cannot aid the violator of an oath." *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1581 (Fed.Cir.1993); *Shamrock Technologies, Inc. v. Medical Sterilization, Inc.,* 903 F.2d 789, 795 (Fed.Cir.1990).

The Court believes that, if this patent had already issued, the doctrine of assignor estoppel would apply to bar Okuley's claims that Dr. Lightner's name should be excluded as a co-inventor of the FAD2 gene. However, since no patent has issued, the Court cannot apply the doctrine because it has

no jurisdiction to consider Okuley's claims concerning inventorship. Patent law provides two avenues for correcting inventorship. If a patent has already been issued, 35 U.S.C. § 256 provides the following remedy:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

The parties agree that this statute does not apply because no patent has yet been issued.

When parties seek to correct inventorship on a patent application that is still pending, 35 U.S.C. § 116 applies instead. It provides, in relevant part:

Whenever through error a person is named in an application for patent as the inventor, or through error an inventor is not named in an application, and such error arose without any deceptive intention on his part, the Director may permit the application to be amended accordingly, under such terms as he prescribes.

**\*11** Although 35 U.S.C. § 256 specifically grants a court authority to order that the patent be corrected, § 116 contains no such provision; before a patent issues, only the Director may authorize the amendment. In *Dee v. Aukerman,* 625 F.Supp. 1427 (S.D.Ohio 1986), a § 256 suit, the Court had to decide whether, in the absence of a challenge to a patent's validity, it had subject matter jurisdiction to resolve an inventorship dispute and order correction of an error. The Court found that it did have jurisdiction, noting, "While § 256 does not expressly provide for such an entry into court ...

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Page 10

nonetheless the statute does make reference to correction by the district court, while cryptically omitting precisely when such a court may take jurisdiction." *Id.* at 1429.

This case is distinguishable from *Dee.* As noted, although § 256 at least impliedly grants district courts authority to order correction of inventorship on an issued patent, there is no similar grant of jurisdiction in § 116. As another district court recently noted, "A court may correct the listed inventors on a United States Patent; correction of pending applications for a United States Patent lies with the Commissioner." *Chou v. Univ. of Chicago,* No. 99C4495, 2000 WL 222638 at *2 (N.D.Ill. Feb. 22, 2000).

The Court realizes that this essentially leaves Dr. Okuley without recourse to challenge inventorship until the patent issues. Federal regulations governing amendment of inventorship while a patent is still pending require the consent of each person being added or deleted as an inventor and consent of the assignee. 37 C.F.R. § 1.48(a). It appears unlikely that either Dr. Lightner or Du Pont would be willing to consent to having Dr. Lightner's name removed from the patent application.[FN11] However, despite Okuley's apparent lack of remedy, the Court's hands are tied.[FN12] Absent evidence of any authority conferring jurisdiction on this Court to resolve the inventorship issue while the patent is still pending, the Court cannot grant the relief requested by Okuley.

> FN11. It also appears unlikely that Dr. Okuley will consent to having the four other Du Pont scientists names added as co-inventors.

> FN12. This is distinguishable from *Dee.* In that case, Defendants argued that Plaintiff's action should be dismissed because she had failed to exhaust her administrative remedies before the patent commissioner as outlined in the federal regulations. The Court disagreed. It noted that the administrative remedies required the consent of all parties before any correction

could be made. Since Plaintiff was unable to obtain Defendants' consent to the correction, the administrative remedies were not available to her. The Court therefore refused to dismiss the action based on failure to exhaust administrative remedies, noting that § 256 expressly requires only notice and a hearing. *Dee,* 625 F.Supp. at 1430. As noted, § 116 contains no provision for judicial review.

Despite the absence of a specific grant of jurisdiction in § 116, Okuley claims that this Court's jurisdiction to decide whether Lightner's name is properly included as a co-inventor is based on Plaintiff's Complaint because, pursuant to 28 U.S.C.A. § 1338, "district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks." This jurisdiction, however, extends "only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 809 (1988).

In this case, federal patent law does not provide the basis for any of Plaintiff's claims. In fact, Plaintiff invoked this Court's jurisdiction not on the basis of claims arising out of federal patent law, but on the basis of diversity of citizenship. Since federal patent law does not create the cause of action, Okuley must show that Du Pont's right to relief necessarily depends on resolution of a substantial question of federal patent law. He cannot. [FN13] Here, Du Pont seeks a declaratory judgment that, pursuant to the Research Collaboration Agreement and the WSU Faculty Manual, it is the rightful owner of legal title to the FAD2 invention, and that Dr. Okuley is legally obligated to execute the assignments necessary to process the patent application. Plaintiff, as assignee of claims previously held by WSU, also states a claim for breach of the employment contract between Dr. Okuley and WSU, and a breach of Okuley's common law duty

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

to assign rights in FAD2 to WSU.

> FN13. The cases cited by Okuley are distinguishable. In *Rustevader Corp. v. Cowatch,* 842 F.Supp. 171 (W.D.Pa.1993), a father and son were issued a patent as joint inventors. The son's employer then filed suit in state court seeking an order compelling assignment of the patent. Defendants removed the case to federal court. Plaintiff argued that the court had no subject matter jurisdiction because this involved strictly a matter of state contract law. The court disagreed. Since the father, who was listed as one of the joint inventors, was not a party to the employment agreement, the court could not compel assignment based solely on contract law unless it first determined that the son was the sole inventor; this, in turn, raised a substantial federal question involving patent law, making jurisdiction proper under 28 U.S.C. § 1338. The court explicitly noted that if the son were the only defendant, it would not have jurisdiction. *Id.* at 173. In this case, both Dr. Okuley and Dr. Lightner are bound by the same contract-the WSU Faculty Manual-and Plaintiff's claims are limited to an interpretation of that contract.
> In *MCV, Inc. v. King-Seely Thermos Co.,* 870 F.2d 1568 (Fed.Cir.1989), the patent had already issued and the suit for correction of ownership was brought under § 256, which provided the proper jurisdictional basis.

**\*12** Each of Plaintiff's claims turns strictly on contract law, requiring an interpretation of Okuley's duty to execute the assignment based on the Research Collaboration Agreement and the WSU Faculty Manual. It is well settled that contract disputes involving an underlying patent do not " arise under" patent law as required by 28 U.S.C. § 1338(a). *Beghin-Say Int'l, Inc. v. Ole-Bendt Rasmussen,* 733 F.2d 1568, 1571 (Fed.Cir.1984); *Boggild v. Kenner Products,* 853 F.2d 465, 468 (6th Cir.1988)(distinguishing patent claims arising

under patent laws from contract claims in which patent issues are incidentally implicated). The fact that one of Okuley's counterclaims, seeking a declaration that he is the sole inventor of FAD2, may depend on resolution of a substantial question of federal patent law is irrelevant because, under the well-pleaded complaint rule, the Court may look only to Plaintiff's complaint and not to any defenses or counterclaims asserted by the Defendant. *Rath Packing Co. v. Becker,* 530 F.2d 1295, 1303 (9th Cir.1975), *aff'd on other grounds,* 430 U.S. 519 (1977); *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.,* 131 F.3d 1011, 1013-14 (Fed.Cir.1997).

Furthermore, resolution of the inventorship issue is not required in order to decide the other issues contained in the cross motions for summary judgment. Both parties agree that Okuley is one of the inventors of FAD2. As an inventor, ownership rights initially vested in him. *Beech Aircraft Corp. v. EDO Corp.,* 990 F.2d 1237, 1248 (Fed.Cir.1993). The central question in this case focuses on the impact of the Research Collaboration Agreement, the WSU Faculty Manual, and Ohio Revised Code § 3345.14(B) on Okuley's obligation to assign his interests in the invention to Du Pont, and to execute additional assignments in connection with the CIP applications. Whether Okuley is listed as the sole inventor or as a co-inventor of FAD2 is simply irrelevant to those issues. Because Plaintiff's claims do not arise under federal patent law, and because Plaintiff's right to relief does not necessarily depend on resolution of a substantial question of federal patent law, the Court finds that 28 U.S.C. § 1338 provides no authority for this Court to determine whether Okuley is the sole inventor of FAD2.

Even if the Court had jurisdiction to consider his claim of sole inventorship, Dr. Okuley faces two other insurmountable obstacles. First, the fact that he has assigned his entire interest in FAD2 to Du Pont is fatal to his claim. [FN14] Having relinquished all rights in the invention, he no longer has standing to challenge the named inventors because he has no cognizable injury. *Kucharczyk v. Regents of Univ. of Cal.,* 48 F.Supp.2d 964, 973-75 (N.D.Cal.1999); *Chou v. Univ. of Chicago,* 2000 WL 222638 at *2. Du Pont, as the assignee, is the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 12

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

only party that can now challenge Lightner's inclusion as a co-inventor. Second, the doctrine of equitable estoppel operates to bar Okuley's challenge to inventorship since he waited five years before protesting the inclusion of Dr. Lightner's name as a co-inventor. *MCV, Inc. v. King-Seely Thermos Co.,* 870 F.2d 1568, 1571-74 (Fed.Cir.1989).

> FN14. As the Court finds below, Okuley did have a duty to assign his rights in the FAD2 invention to Du Pont and that assignment was valid.

**\*13** Okuley also seeks to challenge Du Pont's failure to include him as an inventor on CIP applications 1043A, 1043B, and 1043D. He claims that since his generalized invention forms the foundation for all of Du Pont's new claims, he should be listed as the sole inventor, or at least as a co-inventor on each CIP application. Again, the Court finds that it lacks jurisdiction to consider this claim or to grant Okuley the remedy requested. Whether Okuley has a right to be listed as the inventor or co-inventor on the CIP applications involves the same questions raised by his claim that he should be found to be the sole inventor on the original application. The reasons discussed above for denying Okuley's claim that he be found to be the sole inventor on the original application apply with equal force to a denial of his claim that he be found to be the sole inventor or co-inventor on the CIP applications.

**B. Who has ownership rights in the invention?**

As noted earlier, absent any agreements to the contrary, ownership rights in an invention initially vest in the inventor or inventors. The inventors are then free to assign their ownership rights to others, usually for a profit. In this case, no one disputes that Dr. Okuley is one of the inventors of the FAD2 gene. However, there are two documents and one statute that potentially intercepted the vesting of ownership rights in the FAD2 gene in Dr. Okuley: 1) Ohio Revised Code § 3345.14(B); 2) the Research Collaboration Agreement between Dr.

Browse and Du Pont; and 3) the Washington State University Faculty Manual. The Court will discuss each of these in turn.

**1. Ohio State University**

Although he was still an employee of Washington State University, Dr. Okuley was conducting his research in a laboratory at The Ohio State University when he discovered the FAD2 gene. Ohio Revised Code § 3345.14(B) states:
All rights to and interests in discoveries, inventions, or patents which result from research or investigation conducted in any experiment station, bureau, laboratory, research facility, or other facility of any state college or university ... shall be the sole property of that college or university. No person, firm, association, corporation, or governmental agency which uses the facilities of such college or university in connection with such research or investigation ... shall have any rights to or interests in such discoveries or inventions, including income therefrom, except as may, by determination of the board of trustees of such college or university, be assigned, licensed, transferred, or paid to such persons or entities ...

Since the discovery of FAD2 undisputably resulted from research conducted in a laboratory at OSU, a public institution, under the plain language of the statute, OSU would have a legitimate claim to sole ownership of the invention. When Okuley discussed his invention with Jim Wilkens of OSU's Technology Transfer Office, Wilkens indicated that Okuley had a duty to disclose the invention to OSU and that, pursuant to this statute, OSU had the right to assert a claim to the invention. Based on what Wilkens told him, Okuley refused to execute his assignment to Du Pont until OSU waived its rights in the invention. (Morrissey Aff. ¶ 6).

**\*14** Okuley now claims that this statute cut off any claims of ownership that may be asserted by WSU or Du Pont. The Court disagrees. OSU was aware that Okuley was an employee of WSU, was being paid by WSU, and was conducting research in connection with a sponsorship agreement with Du

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 13

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Pont. Based on that knowledge, although OSU clearly had a right to assert a claim, it chose not to assert any ownership rights in the FAD2 gene. Instead, OSU willingly executed an assignment of any ownership rights it may have been able to claim by virtue of the statute. Jim Wilkens of OSU collaborated with Bruce Morrissey at Du Pont in drafting the assignment. Although it is unclear why, Wilkens claimed that OSU could not assign its rights directly to WSU or to Du Pont but could assign them to Okuley subject to the rights of those third parties. Therefore, on May 28, 1993, OSU executed an assignment that read as follows:

Dear Dr. Okuley:
Upon the recommendation of Dr. James Wilkens of our Office of Technology Transfer, and in view of the circumstance that your contributions to this invention were partly made while you were at Washington State University and that any contributions to this invention made while you were a visitor in Prof. Keith Davis' laboratory at Ohio State University were made by you in your capacity as an employee of Washington State University, The Ohio State University hereby waives any claim it might have in this invention and in any patent rights therein, and transfers the same to you, *subject to any rights of Washington State University or its research sponsor, E.I. du Pont de Nemours, Inc.*

(Ex. 31 to Def.'s Mot. Summ. J.)(emphasis added). FN15

> FN15. The Court notes that on the very same day Okuley received this assignment from OSU, he assigned all of his rights in the invention to Du Pont.

Since this waiver, by its express terms, did not cut off Okuley's obligations that may have existed as a result of the sponsorship agreement with Du Pont or as a result of his employment relationship with WSU, the Court must therefore assess what rights Du Pont and WSU could rightfully claim in the FAD2 gene.

### 2. Du Pont and WSU

One of the central issues in this case is whether Dr. Okuley is obligated to assign his ownership rights in the FAD2 invention to Du Pont by virtue of the Research Collaboration Agreement between Dr. Browse and Du Pont. Okuley claims that he did not have a legal duty to assign his rights to Du Pont because the Research Collaboration Agreement was solely between Du Pont and Dr. Browse. Okuley essentially argues that, since he is not a party to the agreement, he is not bound by it. Furthermore, because no language in the agreement obligates those working under Dr. Browse's direction to assign patent rights to Du Pont, Okuley claims that this agreement could not give rise to a duty to assign his rights to Du Pont. Plaintiff contends that even if Okuley was not personally bound by the terms of the Research Collaboration Agreement, he is still obligated to assign his rights to Du Pont because Washington State University's patent policy requires him to do so.

### a. Research Collaboration Agreement

**\*15** The Research Collaboration Agreement is in the form of a letter directed solely to Dr. Browse, and contains numerous references to "you," apparently referring only to Dr. Browse.FN16 For example, paragraph 6 states that "[y]ou agree to ... assign all rights and title to such ideas and improvement to Du Pont" and "you shall at our request execute all papers we deem necessary or advisable for the filing and prosecution of such patent applications ..." However, paragraph 5(a) states, "You *and individuals working under your direction* shall not transfer or give any such Biological Material or any portion thereof to any third party without the prior written permission of Du Pont." In addition, paragraph 7 states, "[y]ou *and individuals working under your direction* shall not disclose to others before obtaining Du Pont's written consent any unpublished information concerning Du Pont's business and research activities ..." (emphasis added).

> FN16. The Court notes that the word "you" may be a singular or plural pronoun. However, it the context of this agreement,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

it appears to apply only to Dr. Browse.

Although the Research Collaboration Agreement is
hardly a model of draftsmanship, the Court finds
that the two references to individuals working under
Dr. Browse's direction indicate that the parties
clearly contemplated that Dr. Browse would not be
working on this project all by himself, but would
supervise others in accomplishing its goals. There is
no dispute among the parties who executed the
document that they intended that the entire
Research Collaboration Agreement would apply to
all employees working under Dr. Browse's
supervision. Although the language of the
agreement appears to obligate only Dr. Browse to
assign his rights in the invention and to execute all
necessary paperwork in connection with the patent
applications, the parties clearly contemplated that, if
necessary, Dr. Browse would also direct those
under his supervision to do the same.[FN17]

> FN17. In this case, since Dr. Okuley
> voluntarily executed the assignment at
> Bruce Morrissey's request, Dr. Browse did
> not need to direct him to do so.

In the Court's view, despite what the parties to the
agreement intended, basic contract law dictates that
parties to an agreement normally have no authority
to bind non-parties to its terms. To that extent, Dr.
Okuley's argument has some merit. However, even
if Dr. Okuley is not bound directly by the Research
Collaboration Agreement, WSU did sign the
sponsorship agreement, is a party to it, and is bound
to abide by its terms. Dr. Okuley was a faculty
member and employee of WSU. The university's
Faculty Manual and Patent Policy provide the
conduit necessary to impose upon Dr. Okuley the
duty to execute the necessary assignments.

b. Washington State University Faculty Manual and
Patent Policy

Both Du Pont and Dr. Okuley agree that Dr.
Okuley, as an employee of Washington State
University, was bound by the terms of the WSU
Faculty Manual and the patent policy contained in

it. Washington law recognizes the enforceability of
contractual terms contained in employee
handbooks. *Thompson v. St. Regis Paper Co.,* 685
P.2d 1081, 1086 (Wash.1984).[FN18] The relevant
portions of the patent policy read as follows:

> FN18. Since this Court's jurisdiction is
> based on diversity of citizenship, it must
> apply the choice of law rules of the forum
> state, Ohio. *Klaxon Co. v. Stentor Elec.
> Mfg. Co.,* 313 U.S. 487, 496 (1941). In
> cases involving a contract dispute, the laws
> of the state with the most significant
> relationship to the contract control. *Miller
> v. State Farm Mutual Auto Ins. Co.,* 87
> F.3d 822, 824 (6th Cir.1996). The Court
> finds that Washington has the most
> significant relationship to the Washington
> State University Faculty Manual; the Court
> will therefore apply Washington law.

**\*16** This patent policy applies to all University
employees. For the purposes of this policy, "
employee" shall be defined as any person receiving
compensation for service, or any person
volunteering services for the benefit of the
University ... All employees accept the terms of this
policy as conditions of employment ...
This policy applies to potentially patentable
discoveries and trade secrets which are developed
using Washington State university equipment,
supplies, facilities, employee time, or trade secret
information ... The University will hold ownership
in patents ...
Where research has been sponsored by private
industry or foundation, licensing of patents shall be
negotiated between the sponsor and the University
or its agent where appropriate ... the University
normally retains ownership of property developed
under a sponsorship agreement and will negotiate
rights to license the property. *The proprietary rights
of the University and of the University's employees
shall be subject to the agreement between the
sponsor and the University.* Agreements with
outside sponsors shall be approved by the Provost,
Vice President-Business and Finance, and Vice
Provost for Research or their designees.
In order to determine the rights of employees and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Page 15

the University, employees shall disclose all potentially patentable inventions and discoveries developed while employed at WSU to the Intellectual Property Committee for review ...
*Unless otherwise agreed with an outside sponsor, the University shall own the rights to all patentable property developed as a result of University employment ...*
The Intellectual Property Committee will determine whether the potentially patentable property is owned by the university, by the employee, jointly by the University and the employee, or by an outside sponsor ...
The Intellectual Property Committee shall make its determination of ownership, or request additional time, within 45 days of full disclosure ... If the Intellectual Property Committee fails to notify the employee in writing of determination of ownership within 50 days of full disclosure .... then the University's rights in the patentable property shall automatically become the property of the employee.
After the determination by the Intellectual Property Committee ... the employee shall execute documents of assignment to convey to the University, or its assignee, all of the employee's interest in the invention determined to be owned by the University and assist in obtaining, protecting, and maintaining patent rights.

(Ex. I to Pl.'s Mot. Summ. J.).

Since Okuley was being paid by WSU while he was working at Ohio State University, he is clearly subject to the terms of this patent policy. Under the terms of the policy, WSU clearly owns the rights to any patentable inventions developed by him, unless there is a preexisting agreement to the contrary. The patent policy clearly contemplates that the university and university employees may enter into sponsorship agreements with private entities, and may agree that the outside sponsor owns rights to patentable inventions developed as a result of those agreements. The university must approve these agreements but, once approved, the proprietary rights of everyone concerned become subject to the terms of that sponsorship agreement.

*17 That is what happened in this case. Dr. Browse entered into a sponsorship agreement with Du Pont.

FN19 When WSU approved the terms, it became a party to the agreement and, with one exception, agreed to waive all rights that it would normally be able to claim in any inventions that were discovered as a result of that particular research. Specifically, it agreed that, unless its employees cloned the FAD2 gene in other oilseed species after Du Pont scientists had unsuccessfully attempted to do so for a period of nine months, Du Pont would hold legal title to all patentable inventions arising out of the agreement. According to the express terms of the patent policy, all proprietary rights of the university and university employees became subject to the terms of that Research Collaboration Agreement.

> FN19. Okuley claims that the Research Collaboration Agreement does not constitute a "sponsorship agreement" as that term is used in the patent policy because Du Pont provided only biological material, not any funding for the research. The Court does not view Du Pont's failure to provide research funding as significant. Dr. Browse testified that merely being given access to Du Pont's extensive library of tagged *Arabidopsis* mutants provided a significant benefit. The agreement itself refers to Du Pont's "extremely high" financial investment in developing this library.

Dr. Okuley testified that he was aware, even before he accepted the job, that Browse was collaborating with Du Pont on this project. (Okuley Dep. at 37). Dr. Okuley discovered the FAD2 gene as a result of his employment at WSU. If he had not been employed by WSU as a post-doctoral researcher, he would not have had the opportunity to work on the Du Pont project and would not have had access to the biological material needed to make the discovery. Therefore, even though the Research Collaboration Agreement does not specifically obligate Dr. Okuley and others working under Dr. Browse's direction to assign their rights in patentable inventions to Du Pont, the patent policy does. The patent policy obligates Okuley to assign his rights to Washington State University; in turn, the Research Collaboration Agreement obligates

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Washington State University to waive those rights in favor of Du Pont.

Dr. Okuley advances several additional reasons why he should not have to assign his rights in FAD2 to Du Pont: 1) since the FAD2 gene was discovered while he was using a research method contrary to that specified by Dr. Browse, he was acting outside the scope of his assigned duties, making the Research Collaboration Agreement inapplicable; 2) since Du Pont scientists failed to clone the corresponding gene in other oilseed crops within nine months after he first isolated it, legal title to the invention vested in WSU and, because of certain breaches of the Faculty Manual, title subsequently vested in him; 3) because the Intellectual Property Committee failed to determine who owned the FAD2 gene within forty-five days after disclosure of his invention, all ownership rights vested in him pursuant to the terms of the patent policy; and 4) WSU's failure to negotiate a license agreement with Du Pont constitutes a breach of WSU's employment agreement with him.[FN20] None of these arguments has any merit.

> FN20. The Court notes that the third and fourth claims were essentially rendered moot when the Court dismissed the Third Party Complaint against WSU on Eleventh Amendment grounds. However, to the extent Defendant claims that these alleged breaches by WSU still have an impact on ownership rights in the FAD2 gene, the Court will discuss them briefly.

First, Dr. Okuley claims that he was acting outside the scope of his assigned duties when he discovered the FAD2 gene because he was not using the research method that Dr. Browse had directed him to use. In fact, neither Dr. Browse nor Du Pont were aware that Okuley had resumed research on line 658-75. Okuley claims that since he was not acting under Dr. Browse's "direction," the Research Collaboration Agreement does not apply to him. This argument is meritless. Although Dr. Browse was in charge of the project, and although he told Okuley that he preferred that he concentrate his efforts on the low stringency method using the

FAD3 gene as a probe, this does not mean that Okuley was acting outside the scope of his assigned duties. Dr. Okuley was attempting to isolate the FAD2 gene; this is the precise goal set forth in the Research Collaboration Agreement. Okuley was also using biological material provided by Du Pont for that exact purpose. The method by which he accomplished the desired result is not important.

*18 Furthermore, Okuley was a post-doctoral researcher with specialized skills and knowledge. Certainly, he was given some autonomy to decide how to best achieve the desired result. At his deposition, Dr. Browse testified that he told Lightner and Okuley that "if they could pursue experimental strategies that would test the possibility further that the T-DNA was tagging the FAD2 gene in 658, then they had my blessing to do so." (Browse Dep. at 53). Browse also testified that, although he made his preferences known, he never expressly prohibited Lightner and Okuley from pursuing this particular line of research or indicated that they would suffer adverse consequences if they did. (Browse Dep. at 130-31). At Okuley's deposition, he described Browse's managerial style as "loose" and noted that his role "was basically to provide you the atmosphere where you could get research done and be productive. He gave me ... latitude on determining a project to pursue." (Okuley Dep. at 88). The Court further notes that once Dr. Okuley was certain that he had isolated the FAD2 gene, Dr. Okuley immediately notified Dr. Browse and then, at Dr. Browse's request, sent a DNA sample to Du Pont. If Okuley truly believed he was acting outside the scope of his assigned duties, it is unlikely that he would have disclosed the information so readily to Browse and Du Pont. Based on the totality of the circumstances, the Court finds that no reasonable jury could find that Dr. Okuley was acting outside the scope of his assigned duties simply because he decided to pursue further research on line 658-75.

This brings the Court to Okuley's next set of arguments, which arise out of conflicting interpretations of several key definitions contained in the Research Collaboration Agreement, specifically the terms "Primary DNA," "Secondary DNA," and "isolated." As an initial matter, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

Court questions whether Okuley, a non-party to the agreement, has standing to raise these arguments when all parties to the agreement-Dr. Browse, Du Pont, and WSU-concur as to their intended meaning. The Court will nevertheless proceed to address Okuley's claims because their resolution is important to understanding the basis for his duty to execute the assignment.

The Research Collaboration Agreement sets forth definitions of primary and secondary DNA. " Primary DNA" is defined as "DNA isolated from *Arabidopsis* by the tDNA tagging method (mutant and corresponding wild type DNA)." Secondary DNA is defined as "DNA isolated from any source using the Primary DNA as a probe." Okuley presents expert testimony that, according to these definitions, the FAD2 gene is "secondary" DNA because he used primary DNA as a probe to screen the *Arabidopsis* cDNA library and isolate the FAD2 gene. Dr. Browse, WSU, and Du Pont, on the other hand, contend that the FAD2 gene which Okuley isolated is primary DNA; they also present expert testimony to support their position. Despite the difference of opinion among the experts, the Court finds that this is not a genuine issue of material fact precluding summary judgment in favor of Du Pont.

**\*19** If, based on the expert testimony, a jury were to find that the FAD2 gene should be classified as primary DNA, Du Pont would be the rightful owner; this is clearly spelled out in the agreement. On the other hand, if a jury were to find that the FAD2 gene should be classified as secondary DNA, the jury would then have to determine whether Du Pont scientists successfully cloned the corresponding gene in other oilseed crop species within nine months after Dr. Okuley isolated the FAD2 gene. Under the terms of the agreement, if Du Pont scientists accomplished this task within nine months, Du Pont would again clearly be the rightful owner. However, if they failed to accomplish the task within nine months, and university employees were later successful, WSU would be the rightful owner and would have to offer Du Pont the right of first refusal on an exclusive license.

This dispute centers on the meaning of the term "

isolated." Based on the premise that FAD2 is secondary DNA, Okuley claims that since more than nine months passed from the time he first " isolated" the FAD2 gene until Du Pont scientists were able to clone corresponding genes in other species of plants, rights to the gene vested in WSU instead of Du Pont.[FN21] Although he did not know the significance of the event at the time, Okuley claims he actually "isolated" the FAD2 gene in *Arabidopsis* no later than December 9, 1991. [FN22] Since Du Pont scientists did not clone the corresponding genes in other species until October of 1992, he claims that rights to the gene vested in WSU, triggering the duty to offer Du Pont an exclusive license.

> FN21. This argument forms the basis for Okuley's subsequent arguments that because WSU breached certain terms of the Faculty Manual, title in the invention vested in him.

> FN22. In fact, Okuley claims that Feldmann and Aegerter "isolated" the DNA before he ever arrived at WSU.

Du Pont, on the other hand, claims that Okuley did not "isolate" the FAD2 gene in *Arabidopsis* until September of 1992, and that its scientists successfully cloned the genes in other species within weeks after that. Du Pont claims that the FAD2 gene could not be considered "isolated" until Okuley knew for certain that he had discovered it and disclosed the invention to Du Pont. The Court agrees. No reasonable trier of fact could conclude that Okuley "isolated" the gene in December of 1991 as that term was intended by the parties to be construed. Knowledge of the isolation must be implied in this case. Okuley stated at his deposition that, at the time he rescued the single plasmid known as line 658-1, it was "absolutely certain that I did not know that I had a plasmid that encoded FAD2." (Okuley Dep. at 140). Certainly, if no one, including Okuley, realized that the gene had been isolated, no one would be able to use that information to clone corresponding genes in other species. To start the clock running before anyone realized the FAD2 gene had been isolated would be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Page 18

absurd. The Court therefore finds that the FAD2 gene was "isolated" in September of 1992 when Okuley had completed sufficient sequencing to know that he had cloned it. Since Du Pont scientists successfully cloned the gene in October or 1992, within weeks after Okuley disclosed his discovery to them, they were well within the nine month time period. Therefore, whether FAD2 is classified as " primary" or "secondary" DNA is irrelevant. Even if it is secondary DNA, no reasonable jury could find that Du Pont scientists failed to isolate the corresponding gene in other plant species within nine months after Dr. Okuley first isolated FAD2.

**\*20** Okuley's claim that rights to the invention vested in WSU because Du Pont scientists failed to clone the corresponding gene in other plant species within nine months after he first isolated the FAD2 gene in *Arabidopsis* also fails for a second reason. It simply does not make sense. The parties clearly contemplated that once a sought-after gene was isolated in *Arabidopsis,* Du Pont scientists would have nine months to clone the corresponding gene in other species. Only if this proved very difficult to accomplish would the university be given the opportunity to attempt to do the same. If the university was successful, rights to the invention would vest in WSU and it could pursue a licensing agreement with Du Pont. Even if a trier of fact found that Okuley "isolated" the gene more than nine months before Du Pont scientists were able to clone the corresponding gene in other species, the contract provision vesting rights in WSU is never triggered because no WSU employee, including Dr. Okuley, ever identified or cloned the FAD2 gene in any plant other than *Arabidopsis.*

In summary, whether FAD2 is classified as "primary " or "secondary" DNA is ultimately irrelevant because no reasonable jury could find that Du Pont scientist failed to isolate and clone the corresponding gene in other plant species within nine months after Dr. Okuley "isolated" it. The Court therefore finds, as a matter of law, that, pursuant to the terms of the Research Collaboration Agreement, Du Pont is the rightful owner of the FAD2 gene.

Dr. Okuley next contends that because the

Intellectual Property Committee failed to determine who owned the FAD2 invention within forty-five days after his disclosure, ownership in the invention vested solely in him, and he therefore had no duty to assign his interest to Du Pont.[FN23] Under the terms of the patent policy, Okuley clearly had a duty to disclose his invention to WSU. On January 12, 1993, Okuley sent a fax to Larry Simonsmeier, Director of Intellectual Property at WSU. The fax included a copies of the December 1989 Research Collaboration Agreement, an October 21, 1992 letter from Linda Floyd to Browse, Lightner, and Okuley requesting inventorship information, Okuley's October 31, 1992 response to that letter, and Linda Floyd's November 17, 1992 assessment letter naming Lightner and Yadav as inventors. (Ex. 90 to Def.'s Reply Mem.).

> FN23. Dr. Okuley classifies the committee's failure to make a determination as a "breach" of the patent policy. The Court takes issue with this label. The policy simply states that if no determination is made within the time allotted, ownership of the university's rights vests in the inventor. Since nothing in the policy requires the committee to take affirmative action, its failure to act in a timely manner does not necessarily constitute a "breach."

Du Pont claims this facsimile did not constitute " full disclosure" as required to trigger the forty-five day period because none of the letters contained specific information about the invention; Okuley claims that the information he sent was sufficient. The parties also dispute whether the existence of the sponsorship agreement negated the need for the Intellectual Property Committee to make a determination of ownership. The Court finds that these are not genuine issues of material fact.

Even if Okuley's correspondence was sufficient to trigger the forty-five day period, and even if the Intellectual Property Committee "breached" some duty by failing to notify him in writing within forty-five days of its determination of ownership, this is of no significance. The patent policy states

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 19

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

that in the event of such a failure, only the *university's* rights vest in the employee. In this case, WSU never had any ownership rights in the invention because it approved the Research Collaboration Agreement, waiving all claims to inventions arising out of the agreement in favor of Du Pont. In short, since WSU had no ownership rights in the FAD2 gene, there was nothing to "vest" in Dr. Okuley, even if the committee failed to make a timely determination.

**\*21** Finally, Okuley claims that WSU breached the employment agreement by failing to negotiate a licensing agreement with Du Pont.[FN24] Relevant portions of the patent policy state:

> FN24. Okuley testified at his deposition that "it was my belief that I may have an obligation to assign it to Du Pont but I didn't have to assign it to them without compensation." (Okuley Dep. at 269).

Licensing the use of the property provides an opportunity for both income to the inventor and support for further University research ... Where research has been sponsored by private industry or foundations, licensing of patents shall be negotiated between the sponsor and the University or its agent where appropriate. The University will strive to protect the financial interests of all ... The University normally retains ownership of property developed under sponsorship agreements and will negotiate rights to license the property.

Nothing in the Faculty Manual requires WSU to negotiate a licensing agreement with corporate sponsors; it states that licensing agreements will be negotiated "where appropriate." The parties in this case determined that a licensing agreement would be "appropriate" only if Du Pont failed to clone corresponding genes in other oilseed crop species within nine months after the primary DNA was isolated, and Dr. Browse later succeeded in doing so. Since that condition never materialized, and WSU never obtained an ownership interest in the gene, there was no need for a licensing agreement. The Court finds, as a matter of law, that WSU had no duty to negotiate a licensing agreement with Du

Pont; therefore, there was no breach, and WSU's failure to negotiate such an agreement has no impact on this ownership dispute.

In short, under the terms of the Research Collaboration Agreement, Du Pont is the rightful owner of the FAD2 gene. Dr. Okuley's duty to execute the assignment to Du Pont arises out of the interplay between Okuley's obligations under WSU's patent policy and WSU's approval of the Research Collaboration Agreement. None of the arguments presented by Dr. Okuley creates genuine issues of material fact precluding summary judgment on this issue.[FN25]

> FN25. The parties did not brief Du Pont's claim that Okuley also breached his common law duty to assign rights in his invention to his employer. Because the Court finds that Dr. Okuley did have a duty to assign his rights in the FAD2 invention to Du Pont by virtue of the WSU patent policy, and did breach that contractual duty, the Court need not discuss the common law duty claim.

**C. Was Okuley's assignment to Du Pont valid?**

On May 28, 1993, Dr. Okuley executed an assignment transferring to Du Pont his "entire right, title, and interest in" the application for Letters Patent for his invention "Fatty Acid Desaturase Genes from Plants," and the "entire right, title, and interest in and to any and all ... inventions ... disclosed in the aforesaid application." (Ex. R to Pl.'s Mot. Summ. J.). Dr. Lightner executed a similar assignment in favor of Du Pont. Okuley and Lightner also executed Declarations and Powers of Attorney enabling Du Pont to prosecute the application and conduct all business related to the patent.

Okuley now claims that his assignment is null and void because it was fraudulently induced. Okuley essentially alleges that Bruce Morrissey, in-house counsel for Du Pont, led him to believe that he was also acting as Okuley's attorney, and falsely informed Okuley that he had a duty to execute the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Page 20

assignment, intending that Okuley rely on his misrepresentation, and that Okuley did rely on that advice to his detriment. In the alternative, Okuley claims that since both parties mistakenly believed that he had a contractual duty to execute the assignment, the assignment is void under the doctrine of mutual mistake. Plaintiff denies the allegations of fraudulent misrepresentation and mutual mistake.

**\*22** In order to determine the validity of the assignment, the Court must first determine the appropriate choice of law. As noted earlier in this Memorandum and Order, since this Court's jurisdiction is based on diversity of citizenship, it must apply the choice of law rules of the forum state, in this case, Ohio. *Klaxon,* 313 U.S. at 496. In a case involving a contract dispute, where the parties have not specified which state's law should govern, Ohio's choice of law rules dictate that the Court apply the laws of the state with the most significant relationship to the contract, and the law of the state where the contract was made presumptively controls. *Miller,* 87 F.3d at 824. Factors to be considered include: (1) the place of contracting; (2) the place of negotiating; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *National Union Fire Ins. Co. v. Watts,* 963 F.2d 148, 150 (6th Cir.1992).

Plaintiff claims that the law of the State of Washington should govern because the underlying contracts, including the Research Collaboration Agreement and the WSU Faculty Manual were negotiated and entered into in Washington and that is where performance was contemplated. While this provided a sufficient basis for the Court to apply Washington law in interpreting the Research Collaboration Agreement and the WSU Faculty Manual, the document at issue here is the assignment. Defendant claims that Ohio law should be applied because he was residing in Ohio when he negotiated and executed the assignment.[FN26] The Court agrees that Ohio has the most significant relationship to the assignment. Although the alleged duty to execute the assignment was based on other

contracts that were made in Washington, the assignment itself was negotiated and executed in Ohio and arose from a discovery made while Okuley was conducting research in a laboratory at The Ohio State University.

> FN26. In the alternative, Defendant claims that Delaware law should apply because that is where Du Pont is incorporated.

### 1. Fraudulent Inducement

Under Ohio law, where a litigant seeks to rescind a contract on the ground that it was induced by fraudulent misrepresentations, it must be proved by clear and convincing evidence: (1) that there were actual or implied representations of material matters of fact; (2) that such representations were false; (3) that such representations were made by one party to the other with knowledge of their falsity; (4) that they were made with intent to mislead the other party to rely thereon; and (5) that such party relied on such representations with a right to rely thereon. *Schulz v. Sullivan,* 92 Ohio App.3d 205, 209 (1993)( *citing Cross v. Ledford,* 161 Ohio St. 469 (1954)).

At issue here is whether Bruce Morrissey, Du Pont's in-house counsel, made a knowing, material misrepresentation when he informed Okuley that Okuley had a duty to execute the assignment. There is no dispute that the alleged misrepresentation was material. If Morrissey had not informed Okuley that he had a duty to execute the assignment, Okuley would not have done it. There is also no dispute that Okuley relied on the statement to his detriment.

**\*23** However, Okuley's claim fails on at least three grounds. As to the second element, the Court has already discussed in great detail the fact that Okuley did have a duty to execute the assignment because Du Pont is the rightful owner of the FAD2 gene. Since Morrissey's representation concerning that duty was not false, Okuley's claim of fraudulent misrepresentation fails. This alone is sufficient grounds to deny summary judgment of Dr. Okuley's claim.

The claim also fails because, as to the third and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

fourth elements, Okuley has failed to present sufficient evidence that Morrissey made the statement to Okuley knowing that it was false, and with the intent to mislead him. Okuley claims that Morrissey knew that Okuley had no obligation to assign his rights because Du Pont drafted the agreement which imposed a duty to assign patent rights only on Dr. Browse. This argument is unavailing. The agreement contains language indicating that the parties contemplated that other researchers would be assisting Dr. Browse on the project. Since the WSU Faculty Manual grants all rights in intellectual property to the university, subject to outside sponsorship agreements, Morrissey reasonably construed the agreement to impose a duty on Okuley to execute the assignment. In fact, at the time Morrissey requested that Okuley execute the assignment, everyone involved in the research project, including Dr. Okuley, was of the opinion that Okuley had a duty to execute the assignment because Du Pont was the rightful owner of the FAD2 gene. As additional evidence of Morrissey's knowledge that his representation was false, Okuley alleges that Du Pont refused to give him a copy of the Research Collaboration Agreement until 1995. However, he testified at his deposition that he had a copy of the agreement before he executed the assignment. (Okuley Dep. at 75-76). Since Dr. Okuley has presented no evidence, other than his subjective belief, that Morrissey made the alleged representation with knowledge of its falsity, or that he made the statement with the intent to mislead him, he has failed to satisfy the third and fourth elements.

In a related matter, Dr. Okuley also claims that Bruce Morrissey improperly permitted him to believe that he was acting as Okuley's personal legal counsel. Then, trusting that Morrissey was acting in Okuley's best interests, Okuley allegedly relied on Morrissey's representations concerning his duty to execute the assignment. Okuley first claims that he was led to believe that Morrissey was acting as his personal legal counsel because Okuley signed the Declaration and Power of Attorney which granted Linda Floyd, the Du Pont attorney who had initially worked on the patent application, "the power to prosecute this application and transact all business in the Patent and Trademark Office connected

therewith." Later, when Morrissey sent Okuley another assignment to be executed in connection with the first CIP application, Okuley e-mailed Morrissey expressing concern about how time-consuming his continuing responsibilities might be in connection with the patent application. He also stated that he understood that it was Morrissey's personal opinion that he was bound by the Research Collaboration Agreement. He then wrote, "If, as it states in the declaration, you are acting as my lawyer, I would appreciate your advising me on these concerns." Morrissey replied that Okuley's "obligation to sign stems from your previous contract with Washington State."

**\*24** There is no evidence that Morrissey ever affirmatively told Okuley that he was personally representing him, or that he considered Okuley a " client" and was acting in his best interests. However, Morrissey also admits that, despite Okuley's expressed concerns, he never advised Okuley to retain his own counsel. (Morrissey Dep. at 46). Particularly in light of Okuley's statement that he believed Morrissey was "acting as my lawyer," Morrissey should have clarified that he was representing only Du Pont's interests. He should have told Okuley that, while Du Pont attorneys may have been given Power of Attorney to prosecute the patent, he was not acting as Okuley's personal legal counsel. However, despite Morrissey's failure to clarify the relationship between himself and Okuley, this alone cannot form the basis for a claim of fraudulent inducement.

Okuley has failed to present any evidence that Morrissey purposely permitted him to believe that he was representing Okuley's interests with the intent to mislead him. More importantly, Okuley did not justifiably rely on the alleged misrepresentation. This is true for two reasons. First, the Declaration and Power of Attorney clearly stated that it granted Du Pont attorneys only the power to *prosecute the patent application and transact business* in the Patent and Trademark Office. This is very different from agreeing to represent Okuley's best interests and give him professional legal advice concerning his obligations to execute an assignment. Dr. Okuley is a well-educated man and there is nothing in the record to indicate that he was not fully

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 22

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

capable of reading the Declaration and Power of Attorney and discerning the role that Du Pont attorneys would play.

Second, the Court seriously doubts the sincerity of Okuley's claim that he believed that Morrissey was acting as his personal attorney in all matters concerning the patent. Because Okuley's own actions indicate that he knew that he should not rely on Morrissey to represent his best interests, the Court finds that no reasonable jury could find that he was justified in his belief. Okuley testified that before he executed the first assignment, he considered obtaining his own counsel and made some effort to do so. A friend gave him the name of a patent attorney. (Ex. OO to Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J.). He then attempted to reach the attorney but, after he was told the attorney was no longer with the firm, he made no effort to follow up. (Okuley Dep. at 217). He also testified that in 1994, he consulted another attorney who knew little about patent law but advised him not to sign anything. (Okuley Dep. at 218). Okuley's actions clearly indicate that he knew that Morrissey was not able to offer an objective legal opinion concerning his duty to execute the assignment. While Okuley's minimal efforts to find his own attorney may have been unsuccessful, this does not mean that he was justified in relying on Morrissey instead to protect his legal interests.

*25 For these reasons, Dr. Okuley's failure to obtain competent legal counsel will not be considered as grounds for rescission of the assignment. Okuley claimed at his deposition that, at the time he executed the assignment, he had no idea that he was transferring all of his rights to Du Pont; he assumed the document was a license and relied on Morrissey's representation that he had a duty to execute it.[FN27] (Okuley Dep. at 245). Again, Okuley is a well-educated man and there is no indication that he suffered from any disability which rendered him incapable of reading and understanding the document. Okuley does not claim that Morrissey represented the assignment to be something other than it was. It was clearly labeled an "Assignment" and clearly stated that Okuley was agreeing to "sell, assign, and transfer" to Du Pont his "entire right, title and interest in" FAD2. If he

had questions about the legal effect of the document or his obligations under it, he should have consulted his own attorney before he signed it. He admitted that from the date he received the documents on May 12, 1993 until he executed them on May 28, 1993, he made no effort to seek legal advice. (Okuley Dep. at 247). For these reasons, the Court finds that Okuley's reliance on his alleged belief that Morrissey was acting as his personal attorney was not justifiable, and cannot form the basis for his claim that the assignment was fraudulently induced.

> FN27. It was only after he received the proposed assignment in connection with the first CIP that he did some research and learned the difference between a license and an assignment. (Okuley Dep. at 267-68).

### 2) Mutual Mistake

In the alternative, Okuley claims that the assignment is void under the doctrine of mutual mistake. Under Ohio law, mutual mistake is a proper basis for rescission of a contract if it relates to a material aspect of the agreement. *Fada v. Information Systems & Networks Corp.*, 98 Ohio App.3d 785, 790-91 (1994). As with fraudulent inducement, mutual mistake must be proved by clear and convincing evidence. In this case, if both parties were under the mistaken belief that Okuley had a duty to execute the assignment, this could be sufficient grounds for rescission, because this would clearly be material. However, since the Court has already determined that Okuley did have a duty to execute the assignment, the doctrine of mutual mistake is inapplicable.

The Court has concluded that Defendant has failed to produce sufficient evidence from which a reasonable jury could conclude that the assignment is void either because it was fraudulently induced or under the doctrine of mutual mistake.

### 3) Due Diligence

Furthermore, Okuley did not act with due diligence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

in seeking rescission based on fraudulent misrepresentation or mutual mistake. He did not seek rescission until he filed his counterclaims in 1998, five years after he executed the assignment. In Ohio, unless a person seeking rescission of a contract on the ground of fraud exercises that right promptly upon discovering the fraud, the claim is barred. *Keyerleber v. Euclid Congregation of Jehovah's Witnesses,* 103 Ohio App. 423, 433 (1957); *Cross v. Ledford,* 161 Ohio St. 469, 474 (1954). Okuley claims that he did not discover the fraud until he hired an attorney in 1995. However, there is no evidence that he sought to rescind the assignment until he filed his counterclaims in 1998. Because he failed to seek rescission in a timely manner, his claims are now barred.

### 4) CIP Applications

**\*26** Okuley claims that even if the original assignment is valid, it did not include within its scope the subject matter contained in the CIP applications for which he has refused to execute subsequent assignments. After Du Pont begin working in September of 1992 to clone the corresponding gene in other oilseed crops, he did some additional work on the FAD2 gene to confirm that he had, in fact, isolated the gene in *Arabidopsis.* Okuley claims that this transformation work created a new generalized claim, that FAD2 can be used to control the level of polyunsaturated fatty acids in plant oil, which formed the basis for the Du Pont scientists' specialized claims. Du Pont denies that this represents any new inventive contribution, since it was simply confirming what Okuley had already claimed-that he had isolated FAD2 in *Arabidopsis.*

An assignment which conveys the entire right, title, and interest in an invention includes "all alterations and improvements and all patents whatsoever, issued and extensions alike, to the extent of the territory specified in the instrument." *Hendrie v. Sayles,* 98 U.S. 546, 553-54 (1879). The CIP applications at issue are simply extensions of the original patent application filed in this case. Therefore, the Court need not determine whether Okuley's additional work constitutes a new

generalized claim because, even if it did, he has a duty to assign his rights in that new claim to Du Pont for the same reasons discussed above.

### IV. Conclusion

Until a patent issues, the Court has no jurisdiction to determine whether Dr. Okuley is the sole inventor of FAD2. Even if it had jurisdiction to consider the inventorship issue, Dr. Okuley has no standing to challenge the inclusion of Dr. Lightner's name since Okuley has assigned his entire interest in the invention to Du Pont. Furthermore, because he waited five years to raise the issue, he is now equitably estopped from challenging the determination of inventorship.

The Court also finds as a matter of law that, under the terms of the Research Collaboration Agreement, Du Pont is the rightful owner of the FAD2 gene. The Ohio State University assigned all interest in the invention to Dr. Okuley, subject to the rights of WSU and Du Pont. Since WSU approved the Research Collaboration Agreement, and agreed that Du Pont would hold legal title to all inventions that arose from that agreement, Dr. Okuley, being bound by the terms of WSU's patent policy as defined in the Faculty Manual, has a duty to execute whatever documents are necessary in order for Du Pont to process the patent.

Finally, the Court finds that the assignment executed by Dr. Okuley on May 28, 1993 is valid. He has failed to show that it should be rescinded either because it was fraudulently induced or because the parties made a mutual mistake. His failure to seek rescission in a timely manner acts as a further bar to his claims. Because Dr. Okuley assigned his entire right, title, and interest in the invention to Du Pont, he must execute whatever additional assignments are necessary in order for Du Pont to process the Continuation-in-Part applications.

**\*27** Based on the foregoing, the Court finds that: 1) Du Pont is entitled to a declaratory judgment that Dr. Okuley has no legal interest in the FAD2 gene; 2) as assignee of WSU's claims against Dr. Okuley,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 24

Not Reported in F.Supp.2d, 2000 WL 1911430 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**


Du Pont is entitled to specific performance of Dr.
Okuley's contractual obligation to assign his rights
in the FAD2 gene to Du Pont, including his
obligation to execute whatever documents are
necessary in order that Du Pont may prosecute the
Continuation-in-Part applications; 3) Dr. Okuley is
not entitled to a declaratory judgment that he is the
sole inventor of the FAD2 gene, or any related
inventions as set forth in the Continuation-in-Part
applications, because this Court lacks jurisdiction to
make that determination. But even if it had
jurisdiction, the Court has found that, by virtue of
the fact that Okuley has assigned his entire interest
in the invention to Du Pont, he has no standing to
challenge the named inventions. To that extent,
Plaintiff's motion for summary judgment (Record at
48) is GRANTED and Defendant's motion for
summary judgment (Record at 49) is DENIED.

S.D.Ohio,2000.
E.I. Du Pont de Nemours and Co. v. Okuley
Not Reported in F.Supp.2d, 2000 WL 1911430
(S.D.Ohio)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                Page 1

Slip Copy, 2006 WL 267185 (M.D.N.C.)

(Cite as: 2006 WL 267185 (M.D.N.C.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
M.D. North Carolina.
**DUKE UNIVERSITY**, a North Carolina nonprofit
and educational institution,
Orexigen Therapeutics, Inc., a Delaware
corporation, Plaintiffs,
v.
**ELAN** CORPORATION, PLC, an Irish
corporation, **Elan** Pharmaceuticals, Inc., a
Delaware corporation, Julianne E. Jennings, an
individual, Eisai Co., Ltd., a
Japanese corporation, **Elan** Pharma International
Ltd., Defendants.
**No. 1:04CV532.**

Jan. 30, 2006.
Blas P. Arroyo, John Paul Higgins, Alston & Bird,
LLP, Charlotte, NC, Craig S. Summers, Paul A.
Stewart, Sheila N. Swaroop, Knobbe Martens Olson
& Bear, LLP, Irvine, CA, for Plaintiffs.

Allon Stabinsky, Anthony Fenwick, Matthew B.
Lehr, Latham & Watkins, LLP, Menlo Park, CA,
Steven C. Cherny, Latham & Watkins, LLP, New
York, NY, Christopher N. Sipes, Jason M. Knott,
Natalie M. Derzko, Covington & Burling,
Washington, DC, Scott A. Schrader, Covington &
Burling, San Francisco, CA, Richard A. Coughlin,
Smith Moore, L.L.P., Mack Sperling, Brooks Pierce
McLendon Humphrey & Leonard, Greensboro, NC,
for Defendants.

*MEMORANDUM OPINION AND ORDER*

OSTEEN, District Judge

*1 Plaintiffs Duke University ("Duke") and
Orexigen Therapeutics, Inc. ("Orexigen") bring this
action against Defendants Elan Corporation, Elan
Pharma International Ltd., Elan Pharmaceuticals,
Inc., Eisai, Inc. ("Eisai"), Eisai Co., and Julianne E.
Jennings. Plaintiffs seek a declaratory judgment of
correct inventorship and ownership of a patent
application and allege violations of the Copyright
Act of 1976 ("Copyright Act"), as amended, 17
U.S.C. §§ 101 *et seq.,* and of state common law.
This matter is before the court on the following
motions: (1) a motion to dismiss under Federal Rule
of Civil Procedure 12(b)(2) for lack of personal
jurisdiction, made by Elan Corporation; (2) a
motion to dismiss under Federal Rule of Civil
Procedure 12(b)(6) for failure to state a claim, made
by Elan Pharmaceuticals, Elan Corporation, and
Ms. Jennings ("Elan defendants"); (3) a motion to
strike under Federal Rule of Civil Procedure 12(f),
made by the Elan defendants; (4) a motion to stay,
made by the Elan defendants; and (5) a motion to
dismiss under Federal Rules of Civil Procedure
12(b)(1) and 12(b)(6), made by Eisai.

I. BACKGROUND

Defendants Elan Corporation, Elan Pharma
International Ltd., and Elan Pharmaceuticals, Inc.
(the "Elan companies"), at times relevant to this
action, owned the U.S. rights to the epilepsy drug
zonisamide. [FN1] Two physicians employed by
Duke, Dr. Kishore Gadde and Dr. Ranga Krishnan,
developed an interest in conducting research on the
use of zonisamide to treat obesity. In a meeting held
in August 2000, Dr. Krishnan suggested to
representatives of the Elan companies that
zonisamide might be used to treat obesity, and in
September and October 2000, Dr. Gadde submitted
proposals to the Elan companies for the purpose of
determining the Elan companies' interest in funding
or providing samples of zonisamide for such a
study. As a result, the Elan companies provided
Duke with funding and zonisamide samples. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 267185 (M.D.N.C.)

(Cite as: 2006 WL 267185 (M.D.N.C.))

Page 2

Elan companies and Duke did not enter into any agreement regarding restrictions on use of the funds and samples or rights to the results of the study.

> FN1. Elan has since transferred these rights to Eisai.

The study was conducted at Duke Medical Center from March 2001 to March 2002. As the study progressed, Dr. Gadde provided updates to representatives of the Elan companies. On several occasions, representatives of the Elan companies requested and received written information about the study. The study ultimately indicated "that obese patients treated with zonisamide over a 16-week period experienced a significantly higher reduction in weight as compared to patients that did not receive the zonisamide." (Compl.¶ 19.) In late 2001, at the request of a representative of the Elan companies, Dr. Gadde provided an explanation of possible pharmacological mechanisms by which zonisamide contributes to weight loss; additionally, Dr. Gadde provided the Elan companies with an abstract of a presentation he intended to make at a May 2002 meeting of the American Psychiatric Association.

*2 In April 2002, at the initiation of Ms. Jennings, who was an employee of one of the Elan companies, Dr. Gadde participated in a telephone call with representatives of the Elan companies, including Ms. Jennings and J. Mark Hoch. [FN2] During the conversation, the representatives elicited from Dr. Gadde detailed information about the use of zonisamide to treat obesity.

> FN2. The representatives indicated that Hoch was from their regulatory department. Duke later learned that he was a patent attorney.

Shortly after the day on which the conversation took place, Ms. Jennings filed a patent application with the U.S. Patent and Trademark Office ("PTO") involving the use of zonisamide to treat obesity. The application was filed without Duke's knowledge. Much of the important information in the application was provided to the Elan companies

by Duke researchers. Portions of the application were copied directly from written materials provided by Duke researchers to the Elan companies. At least some of the information was provided by Dr. Gadde during the April telephone call. In May 2002, Duke filed its own patent application involving the use of zonisamide to treat obesity. [FN3]

> FN3. Duke has since licensed this application to Orexigen.

## II. ANALYSIS

Duke's claims, including the declaratory judgment, copyright violation, and various state law claims, revolve around its belief that Elan has wrongfully claimed ownership of Duke's invention. Both the Elan defendants and Eisai have requested that the court dismiss Duke's declaratory judgment claims, arguing that those claims are committed to the PTO, and both seek dismissal of Duke's state law claims on various grounds. Additionally, the Elan defendants have filed a motion requesting that the court strike a portion of the complaint [FN4] and a motion to stay all claims remaining after consideration of their motion to dismiss. Finally, Elan Corporation has filed a motion to dismiss claiming lack of personal jurisdiction.

> FN4. The Elan defendants have moved to strike Duke's request for statutory damages and attorney's fees under the Copyright Act. This motion is not opposed by Duke and will be granted without further comment.

For reasons stated below, the court concludes that Duke's declaratory judgment claims should be dismissed and its remaining claims stayed pending a decision on the two patent applications by the PTO. Because of this, the court will not rule at this time on the motions as they pertain to the remaining claims but will defer a ruling until the stay is lifted. The court will begin by addressing Elan Corporation's arguments regarding lack of personal jurisdiction, will continue by explaining the decision regarding the declaratory judgment claim,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 267185 (M.D.N.C.)

**(Cite as: 2006 WL 267185 (M.D.N.C.))**

and will conclude by explaining the decision to stay the proceedings.

A. Claims Against Elan Corporation

Elan Corporation has asked the court to dismiss the claims against it under Rule 12(b)(2) due to lack of personal jurisdiction. When a defendant makes a 12(b) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of proving the existence of jurisdiction over the defendant by a preponderance of the evidence. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989) . "But when, as here, the court addresses the question on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." *Id.* The district court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.*

*3 Elan Corporation suggests that the only basis for personal jurisdiction over it is its status as a "great-grandparent" corporation of Elan Pharmaceuticals, and it argues that this status is insufficient to support jurisdiction. Even if Elan Corporation's relationship with Elan Pharmaceuticals may not, by itself, support jurisdiction, the issue is not resolved. Duke's claim is not based solely on the corporate relationship; rather, Duke has alleged that Elan Corporation's agents directly interacted with Dr. Gadde. Although it may be unlikely that those allegations are true, the court must accept them as true for the purposes of this motion. Elan Corporation has not argued that these contacts were insufficient to establish personal jurisdiction. Based upon the pleadings, the court concludes that Duke has made a prima facie showing of personal jurisdiction over Elan Corporation. Nonetheless, Elan Corporation is free to raise the issue again through another type of motion, and the court affirms that the "plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence,

either at trial or at a pretrial evidentiary hearing." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.,* 416 F.3d 290, 294 n. 5 (4th Cir.2005) (internal quotation marks omitted).

B. Declaratory Judgment Act Claims

In its First Claim for Relief, Duke seeks "a declaratory judgment of correct inventorship under 28 U.S.C. § 2201 and 35 U.S.C. § 116, and for a declaration of proper assignment under 28 U.S.C. § 2201 and 35 U.S.C. § 261." (Compl.¶ 41.) Both the Elan defendants and Eisai have filed motions seeking the dismissal of this claim under Rule 12(b)(6). [FN5] A defendant's motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of pleadings, but does not seek to resolve disputes surrounding the facts. *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). A court must determine only if the challenged pleading fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). A pleading "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The pleading must be "liberally construed" in the light most favorable to the non-moving party and allegations made therein are taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969).

> FN5. Both motions adopt essentially the same reasoning. Because the Elan defendants' motion was filed first, the court will address it specifically in this discussion and will not refer to Eisai's brief.

The Elan defendants' argument is grounded on the theory that the power to correct inventorship on patent applications is vested by 35 U.S.C. § 116 [FN6] solely in the PTO and, therefore, a federal district court may not hear a case that requires it to determine whether a party is properly named as an inventor on an application. A review of the decisions by courts of other districts on this topic reveals disagreement regarding whether these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 267185 (M.D.N.C.)

**(Cite as: 2006 WL 267185 (M.D.N.C.))**

actions should be heard. *Compare Post Performance, LLC v. Renaissance Imports, Inc.,* 333 F.Supp.2d 834 (E.D.Mo.2004) (allowing a similar claim to proceed), *and Heineken Technical Servs., B.V. v. Darby,* 103 F.Supp.2d 476 (D.Mass.2000) (same), *with Sagoma Plastics, Inc. v. Gelardi,* 366 F.Supp.2d 185 (D.Me.2005) (dismissing a similar claim), *and Display Research Labs., Inc. v. Telegen Corp.,* 133 F.Supp.2d 1170 (N.D.Cal.2001) (same). The Elan defendants argue that the court does not have jurisdiction over Duke's claims; framing the argument in this way is consistent with the language used in the case law. *See, e.g., Display Research Labs.,* 133 F.Supp.2d at 1174 ("This Court therefore finds that it does not have jurisdiction to correct a patent application...."). Nonetheless, the cases suggest that Elan's motion raises two separate but related questions: (1) whether the court has subject matter jurisdiction over the claim, and (2) whether Duke has a cause of action. The court will address both of these questions.

> FN6. In relevant part, section 116 states: Whenever through error a person is named in an application for patent as the inventor, or through error an inventor is not named in an application, and such error arose without any deceptive intention on his part, the Director may permit the application to be amended accordingly, under such terms as he prescribes.

**\*4** Federal court jurisdiction over claims involving patent law is created by 28 U.S.C. § 1338. [FN7] Jurisdiction exists under § 1338 if "a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 809, 108 S.Ct. 2166, 2174, 100 L.Ed.2d 811 (1988). Several district courts have concluded claims for correction of inventorship on a patent application satisfy the jurisdictional requirements. *See Concrete Washout Sys. v. Minegar Envtl. Sys., Inc.,* No.

CIVS041005WBSDAD, 2005 WL 1683930, at \*3 (E.D.Cal. July 12, 2005) ("Several district courts, whose reasoning the court finds persuasive, have determined that federal courts have subject matter jurisdiction to resolve inventorship issues under 28 U.S.C. § 1338(a)."); *Post Performance,* 333 F.Supp.2d at 840 ("[T]he court concludes that there is an inventorship issue providing a substantial enough issue for federal jurisdiction."); *Heineken,* 103 F.Supp.2d at 477-79 (finding jurisdiction under § 1338 over a similar claim). The court agrees with the conclusion reached in these cases.

> FN7. "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents...." 28 U.S.C. § 1338(a).

This conclusion does not decide the issue, however, because the court's jurisdiction is meaningless if Duke has no cause of action. Section 116 does not include a private cause of action for the correction of inventorship on patent applications. [FN8] *Display Research Labs.,* 133 F.Supp.2d at 1173; *see also Eli Lilly & Co. v. Aradigm Corp.,* 376 F.3d 1352, 1356 n. 1 (Fed.Cir.2004) (stating in dicta that "[t]he text of section 116 ... plainly does not create a cause of action in the district courts to modify inventorship on pending patent applications."). Similarly, the statutory provision on which Duke relies for its claim of assignment, 35 U.S.C. § 261, [FN9] creates no cause of action for the correct assignment of applications. The section allows applications to be assigned by the applicants, but it makes no mention of federal court involvement or circumstances under which applications must be assigned. Thus, there is no direct cause of action for either of Duke's claims.

> FN8. The rationale behind such a conclusion is that 35 U.S.C. § 116 mentions only correction of inventorship by the Commissioner of Patents, not federal courts. *See Display,* 133 F.Supp.2d at 1173. A comparison of section 116 with its companion statute, 35 U.S.C. § 256, which deals with the correction of inventorship on issued patents and does

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                  Page 5

Slip Copy, 2006 WL 267185 (M.D.N.C.)

**(Cite as: 2006 WL 267185 (M.D.N.C.))**

create a private right of action in federal court, suggests that the statutory scheme contemplates federal court involvement only after a patent has issued. *E.I. Du Pont de Nemours & Co. v. Okuley,* 344 F.3d 578, 584 (6th Cir.2003); *Sagoma Plastics,* 366 F.Supp.2d at 187-88.

FN9. In relevant part, section 261 states: Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.

Nonetheless, Duke has not brought its claims directly under § 116 and § 261, but under the Declaratory Judgment Act (the "Act"), 28 U.S.C. § 2201. The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." "The purpose of the Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side." *BP Chems. Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 977 (Fed.Cir.1993).

**\*5** The Act applies only to cases of actual controversy. To determine whether such a controversy exists, a court must determine "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). There is no particularized test for determination of the existence of an actual controversy in patent application cases. However, in patent infringement cases, the Federal

Circuit has created a two-part test to determine whether an actual controversy exists: "There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *BP Chems. Ltd.,* 4 F.3d at 978. Although this test does not apply directly to the case at hand, it does provide useful guidance.

The test suggests that the controversy requirement is only satisfied by the prospect of one of the parties being able to bring the dispute to court. In the context of a patent infringement suit, a disagreement between two parties over the extent of one party's patent rights is insufficient to support a declaratory judgment action, even when the dispute can only be settled by the application of patent law; rather, there must be a prospect of legal action by one of the parties. Applying the reasoning to this case, there is no controversy of sufficient immediacy to support a declaratory judgment action. Although Duke and Elan have adverse interests, in the sense that they both lay claim to the same invention, neither party has a right that can be enforced. Just as Duke may not sue Elan directly, Elan has no cause of action to sue Duke under that provision. The court is not aware that Elan has ever threatened to sue Duke. Furthermore, both applications are currently under consideration by the PTO, and Duke has petitioned the PTO for an interference. The court concludes that, although the controversy between the parties is real, it has not reached the stage where a federal court should be involved. Rather, it is currently in the process of being resolved through established channels and lacks the immediacy to be considered an actual controversy under the Declaratory Judgment Act. Thus, Duke has no cause of action under the Act.

Even were there an actual controversy, the court would refrain to exercise jurisdiction over this action. "[A] district court is not required to exercise declaratory judgment jurisdiction, but has substantial discretion to decline that jurisdiction." *Teva Pharm. USA, Inc. v. Pfizer, Inc.,* 395 F.3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 267185 (M.D.N.C.)

**(Cite as: 2006 WL 267185 (M.D.N.C.))**

1324, 1331 (Fed.Cir.2005). The court is persuaded that the PTO is a better forum for resolving inventorship disputes because of its expertise in the area and its superior access to the relevant information. Additionally, in light of the intent of Congress to reserve these questions for the PTO, the court believes that it would be inappropriate to allow Duke to bypass the established administrative procedure through a declaratory judgment action. *Cf. Consolidated World Housewares, Inc. v. Finkle,* 831 F.2d 261, 265 (Fed.Cir.1987) ("[A district court does] not have original jurisdiction to conduct an interference under § 1338(a) or under any other statute because the United States Patent and Trademark Office was granted that function exclusively....").

C. All Other Claims

\*6 The Elan defendants have asked the court to stay all the claims that have not been dismissed until the PTO has made a determination of inventorship. Because the remaining claims depend on the resolution to the question of inventorship, it is appropriate for the court to stay further proceedings and to refrain from consideration of the motion to dismiss as it pertains to these claims. The court's power to stay proceedings is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936). In determining whether to exercise this power, a court "must weigh competing interests and maintain an even balance." *Id.* at 254-55, 57 S.Ct. at 166. If there is a possibility that the stay could be detrimental to another party, then the movant must justify it by "clear and convincing circumstances outweighing" such possible harm. *Williford v. Armstrong World Indus., Inc.,* 715 F.2d 124, 127 (4th Cir.1983).

Weighing in favor of a stay is the importance of the PTO's determination to Duke's claims. At this time, it is not clear whether this matter involves the theft of an invention or the misappropriation of information. The resolution of this question is

clearly important to Duke's arguments on the merits of three of the four state law claims. With regard to Elan's assertion that Duke's claim of conversion is preempted by federal copyright law, Duke states that "it is Elan's filing of a patent application for Duke's invention and wrongful assertion of ownership of that invention and patent application that form the basis of Duke's conversion claim." (Pl.'s Mem. Law Opp'n Elan Corporation, Elan Pharmaceuticals, Inc., and Julianne E. Jennings' Mot. Dismiss at 7.) The same argument is used to explain why Duke's unfair and deceptive trade practices claim is not preempted. Similarly, with regard to its claim of unjust enrichment, Duke indicated the following: "Elan unjustly enriched itself by filing a patent application on Duke's invention, falsely claiming ownership of Duke's invention. The mere receipt of ... information by Elan does not form the basis of Duke's claim." (*Id.* at 8 (citation omitted).) Additionally, for all of its remaining claims, Duke seeks actual damages. Duke's actual damages are highly dependent on whether its injury is the theft of an invention or a misappropriation of information. It is possible that the PTO may ultimately determine that the invention is not patentable by anyone, in which case the scope of Duke's damages would be limited.

Weighing against a stay is the fact that its length is unpredictable. The PTO has not yet declared an intervention, and there is no way of knowing when or if the PTO will do so. Duke argues that Orexigen would be prejudiced by a lengthy stay because it is currently seeking investors and resolution of this matter would make Orexigen more attractive. This argument is weakened by the court's decision that it will not hear claims of correct inventorship and ownership; a decision in favor of Duke on the copyright and state law claims would not resolve questions of inventorship and ownership in Orexigen's favor. There is no other particular prejudice to Duke from a long stay, except that Duke will have to wait to be compensated for any wrong it may have suffered.

\*7 On balance, the court concludes that it is appropriate to stay these proceedings to resolve the uncertainties surrounding Duke's claims. For that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 7

Slip Copy, 2006 WL 267185 (M.D.N.C.)

**(Cite as: 2006 WL 267185 (M.D.N.C.))**

reason, the court will not at this time evaluate the motions to dismiss by either the Elan defendants or Eisai as they pertain to Duke's additional claims. Those motions will be considered when the stay is lifted.

III. CONCLUSION

For the reasons stated herein,

IT IS ORDERED that Elan Corporation's Motion to Dismiss for Lack of Personal Jurisdiction [16] is DENIED.

IT IS FURTHER ORDERED that the Motion to Dismiss for Failure to State a Claim [18] filed by Elan Corporation, Elan Pharmaceuticals, Inc., and Julianne E. Jennings is GRANTED as to Duke's First Claim for Relief.

IT IS FURTHER ORDERED that the Motion to Strike [19] filed by Elan Corporation, Elan Pharmaceuticals, Inc., and Julianne E. Jennings is GRANTED.

IT IS FURTHER ORDERED that the Motion to Stay [17] filed by Elan Corporation, Elan Pharmaceuticals, Inc., and Julianne E. Jennings is GRANTED as to the remaining claims for relief.

IT IS FURTHER ORDERED that the Motion to Dismiss [26] filed by Eisai, Inc. is GRANTED as to Duke's First Claim for Relief.

Slip Copy, 2006 WL 267185 (M.D.N.C.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2302935 (Trial Motion, Memorandum and Affidavit) Elan Pharmaceuticals', Elan Corporations', and Julianne Jennings' Brief in Support of Motion to Dismiss, Motion to Strike, and Motion for Stay (Aug. 13, 2004)

• 2004 WL 2302937 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendant Eisai Inc.'s Motion to Dismiss (Aug. 13, 2004)

• 2004 WL 2302932 (Trial Pleading) First Amended Complaint and Jury Demand (Jul. 12, 2004)

• 2004 WL 2302927 (Trial Pleading) Complaint and Jury Demand (Jun. 14, 2004)

• 1:04cv00532 (Docket) (Jun. 14, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.